Tony **CHAMBERS**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 71345.

Court of Criminal Appeals of Texas, En Banc.

Oct. 27, 1993.

Rehearing Denied Dec. 8, 1993.

**14**

Donald F. Killingsworth, Tyler, for appellant.

Jack Skeen, Jr., Dist. Atty., and Amy R. Blalock, Asst. Dist. Atty., Tyler, Robert Huttash, State's Atty., Austin, for State.

## OPINION

MILLER, Judge.

Appellant was convicted in August 1991, of capital murder under Texas Penal Code § 19.03(a)(2) for an offense committed in November 1990. Upon the jury's returning affirmative answers to the special issues under Texas Code of Criminal Procedure Art. 37.-071(b), appellant was sentenced to death as mandated by Art. 37.071(e). Under Art. 37.-071(h), direct appeal to this Court is automatic. We will affirm.

Appellant raises twenty-seven points of error challenging: the sufficiency of the evidence to support the jury's finding of guilt; the sufficiency of the evidence to support the jury's affirmative answers to the punishment issues; the sufficiency of the evidence corroborating his various confessions; the trial court's failure to quash the indictment; the trial court's failure to suppress his written, oral, and videotaped confessions as the products of an illegal arrest; the trial court's failure to suppress his written and video-taped confessions on the grounds that they were involuntary; the admission of an illegally obtained confession; the trial court's improper excusal of three venirepersons and the failure of the court to sustain his challenge for cause to another venireperson; the State's improper exclusion of black venirepersons from the jury and the court's denial of appellant's motion for mistrial on *Batson* grounds; the trial court's limitation of appellant's cross-examination of a State's witness to show bias and self-interested motive; the trial court's failure to instruct the jury on the definition of "deliberately"; the court's denial of a special instruction and submission of a special issue regarding mitigating evidence.

Appellant was convicted of intentionally causing the death of an eleven-year-old girl "by strangling her" in the course of committing and attempting to commit aggravated sexual assault. The trial evidence, viewed in the light most favorable to the verdict, established the following:

On November 19, 1990, the victim, attended a basketball game at her school, Dogan Middle School in Tyler. At the game several people saw the victim in the company of appellant; several witnesses testified that they saw appellant and the deceased leave the game together. When she did not return home from the game, her grandfather, with whom she lived, informed her mother, and they filed a missing persons report. On November 21, 1990, the deceased victim's mutilated corpse was found in the woods near Dogan Middle School.

The deceased was found lying on her back, with her dress pulled over her stomach and her legs spread apart. She was not wearing underwear. She had strange cuts on her abdomen. Her shorts, with the crotch area ripped open, and her panties were near the body. Shoelaces were found lying next to the tree where the body was discovered. The area of pine straw surrounding the body was disturbed, indicating a struggle had occurred.

The medical examiner testified that there existed evidence of sexual intercourse within twenty-four hours before death, that several wounds indicated that a struggle had taken place, and that the deceased had been choked to death by a person using his hands. Based on the decomposition and hardening of the body, he estimated that the deceased had been. dead for more than twenty-four hours before the body was found. He also explained that in strangulation once a person becomes brain dead, the heart continues to pump blood for approximately twenty minutes; · to a person untrained in medicine, the dead person may appear to be alive because they may make groaning noises and gasp-like sounds. He opined that the choking had to continue for longer than fifteen minutes to kill the victim. He testified that the mutilation of the deceased's abdomen had been performed *post mortem* and had been inflicted with both a dull and a sharp instrument.

Through appellant's various confessions the following evidence was introduced: Appellant went to the Dogan Middle School basketball game. After a short while, he left the game with the deceased and went into the wooded area near the school. There he twice sexually assaulted the deceased. After the sexual assault, he "snapped," choking the deceased with his hands but not killing her. He tied her hands behind a tree with shoelaces and then started to leave, but he got scared; so he returned to where she was and tied her feet to another tree. She was sitting between the two trees. He attempted again to find his way out of the woods, but on hearing her begging him not to leave her in the woods, his "mind snapped again." He returned and choked her again, telling her to be quiet. After her "neck seemed to pop," he untied her and her body fell to the ground. She started groaning and gasping for air; so he choked her again because he feared that she would tell someone about his earlier attempts to kill her. He choked her until he was certain that she was dead, stating that he "thought she would never die."

Appellant explained that the abdominal cuts and punctures "just happened." Appellant used a scalpel and protractor to make

the mutilations. He later led the police to the discarded instruments.

## I. Sufficiency of Evidence

 Appellant argues that the evidence was insufficient to support a capital murder conviction. A sufficiency review requires that, while viewing the evidence in the light most favorable to the verdict, we ask whether any rational trier of fact could have found beyond a reasonable doubt all of the elements of the offense. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Nelson v. State*, 848 S.W.2d 126, 131 (Tex.Crim.App.1992).

Upon review of the record, including appellant's lengthy and detailed confessions, we determine that a rational trier could have determined beyond a reasonable doubt that the charged offense was committed. Appellant's twentieth point of error is, therefore, overruled.

In his twenty-first point of error, appellant asserts that there was insufficient evidence to corroborate his extrajudicial confessions. Specifically, appellant contends that the evidence was insufficient to corroborate his confessions to the underlying offense of aggravated sexual assault.

 In *Gribble v. State*, 808 S.W.2d 65, 70 (Tex.Crim.App.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2856, 115 L.Ed.2d 1023 (1991)[1], we held that in capital murder cases, as in all other cases, the defendant's extrajudicial confession must be "corroborated by other evidence tending to show that a crime was committed," i.e., by independent evidence of the *corpus delicti*. *Id.* The perpetrator's identity is not a part of the *corpus delicti* and so need not be corroborated. *Id.* But, in capital murder cases, extrajudicial confessions must be corroborated as to the underlying felony offense since it is part of the *corpus delicti*. *Id.* at 71. In *Gribble*, we stated that "evidence independent of appellant's confession was required to show that his victim had been kidnapped," but we emphasized that "such evidence need not ... be sufficient by itself to prove" the underlying offense. *Id.* All that is required is that

---

1. *See also Fisher v. State*, 851 S.W.2d 298 (Tex. Crim.App.1993).

there be some evidence which renders the commission of the offense more probable than it would be without the evidence. *Id.*[2]

■ In the present case, there is ample evidence corroborating appellant's confessions that he sexually assaulted the victim before killing her. The victim was an eleven-year-old girl. Her body was found in the woods near her school, lying on her back, with her dress pulled over her stomach and her legs spread apart. Her panties and shorts were found nearby. The crotch area of her shorts was ripped open. The area of pine straw surrounding the body was disturbed, indicating that a struggle had taken place. Evidence established the presence of spermatozoa in the victim's vagina, and the medical examiner testified that intercourse had occurred within twenty-four hours prior to the victim's death.

A rational trier of fact could find sufficient evidence of the *corpus delicti* of capital murder including the underlying offense of aggravated sexual assault to corroborate appellant's confessions. Appellant's twenty-first point of error is overruled.

■ In point of error twenty-two, appellant contends that the evidence was insufficient for an affirmative answer to the question:

> whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result ...

TEX.CODE CRIM.PROC.ANN. art. 37.-071(b)(1) (Vernon 1981).

The evidence established that appellant sexually assaulted his eleven-year-old victim twice after taking her into some secluded woods near her school. He confessed that he tied her up with her shoelaces intending to leave her in the woods but that he became

afraid that she would report him. So he returned to where she was, with some effort since it was dusk and choked her with his bare hands around her neck. He again attempted to leave, but could hear her making noises; so he returned to insure her death, again choking her. He confessed thinking "that she would never die." After raping and killing the deceased, appellant mutilated the corpse with his scalpel. We believe the evidence supports the jury's finding that appellant acted "deliberately and with reasonable expectation that the death of the deceased ... would result." Appellant's twenty-second point of error is overruled.

■ In his twenty-fifth point of error, appellant challenges the sufficiency of the evidence to sustain an affirmative answer to the second special question:

> whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

TEX.CODE CRIM.PROC.ANN. art. 37.-071(b)(2) (Vernon 1981)

Appellant urges the reformation of his sentence to life imprisonment. The State argues that the heinous facts of this case alone suffice, and, alternatively, that the evidence introduced at punishment was sufficient to establish future dangerousness beyond a reasonable doubt.

We do not believe it is necessary to consider as the State asks, the evidence of the crime itself. The evidence produced at punishment was sufficient of an affirmative response to special issue number two.[3]

In reviewing this issue we ask whether, in the light most favorable to the verdict, any rational trier of fact could have found beyond a reasonable doubt that there is a probability that appellant will commit criminal acts of

---

**2.** In *Gribble* this Court found the evidence of kidnapping "ambiguous in some respects and far from adequate" to support the conclusion implied but nonetheless sufficient to corroborate appellant's confession because "any rational trier of fact could have found that there was some evidence that the *corpus delicti* of kidnapping was sufficiently corroborated as to the elements of appellant complaint." 808 S.W.2d at 73.

(The victim had been found in only a bathrobe with her purse, ten miles from her home).

**3.** *See Vuong v. State*, 830 S.W.2d 929 (Tex.Crim. App.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 595, 121 L.Ed.2d 533 (1992); *Keeton v. State*, 724 S.W.2d 58 (Tex.Crim.App.1987) ("Keeton I") (Exemplary list of evidence to be considered in answering special issue number two.)

violence that would constitute a continuing threat to society. *E.g., Burns v. State,* 761 S.W.2d 353 (Tex.Crim.App.1988). As the punishment evidence supports the jury's finding that appellant is likely to recommit violent crimes constituting a continuing threat to society, we will not consider the probative value of the offense evidence.

The State's evidence of appellant's proclivity toward violence was strong. The State introduced appellant's school records, reflecting a history of violence, destruction, and disregard for authority. Officers from the Tyler Police Department testified about appellant's bad reputation for being peaceful and law-abiding.

Officers from the Smith County Jail testified that appellant was a disciplinary problem who had to be segregated from the prison population because of his inability to interact with the others and his propensity to resort to violence. The officers testified that appellant had at various times flooded his cell, purposely stopping up the toilet; tried to set a fire in his cell; and beat and banged on the doors. A female officer testified about appellant's verbal abuse and threats of violence to officers, particularly the female officers. Both officers testified that they believed the probability existed that appellant would be a continuing danger to others.

The appellant's live-in girlfriend testified that she had often called the Tyler Police because she feared appellant's violence. She testified that he had repeatedly threatened to kill her and that he had once thrown a Molotov cocktail into her house, setting it on fire. She admitted her fear of appellant and her belief that he would continue to commit acts of violence.

Dr. Allens, a clinical psychologist, testified that the acts of sexually assaulting, choking, and mutilating an eleven-year-old demonstrated systematic, destructive, and violent behavior. He added that when such an offense is committed systematically and dispassionately, the likelihood of future repetition increases. He testified that based on the facts of the crime, and on appellant's school and jail records, there was a probability that appellant would be a continuing danger to society.

Dr. McNell, also a clinical psychologist, testified that based on the police, arrest, and school records, he described the crime as "sadistic." He testified that the mutilation of an eleven-year-old's corpse evidenced much poorly controlled anger. He asserted his belief that there was a probability that appellant would commit violent crimes and be a continuing threat to society.

Based on this evidence, a jury could find, beyond a reasonable doubt, the probability that appellant would commit future acts of violence constituting a continuing threat to society. Appellant's twenty-fifth point of error is overruled.

## II. Pretrial

■ Appellant claims in his first point of error that the trial court erred in overruling his motion to quash the indictment. He contends that the indictment was insufficient for failure to state the manner and means of strangulation, thereby denying him sufficient notice upon which to prepare a defense.[4] Assuming *arguendo* that the failure to specify the manner and means of strangulation was error, appellant's first point of error is nonetheless overruled under *Adams v. State,* 707 S.W.2d 900 (Tex.Crim.App.1986) and *Janecka v. State,* 739 S.W.2d 813 (Tex.Crim. App.1987). Under *Adams,* after finding that he was denied some requisite item of notice, in order to prove reversible error, an appellant must show that the omission of the requested information had a deleterious impact on his ability to prepare a defense. 707 S.W.2d at 903.[5]

Appellant provided various confessions in which he described in detail how he strangled the victim with his hands. He had access to these detailed confessions and to the medical examiner's report corroborating the confessed manner of strangulation. In

---

4. Appellant argues with general reference to U.S. CONST., AMEND. VI; TEX. CONST.ANN. art. 1, § 10; and, TEX.CODE CRIM.PROC.ANN. art. 1.05 and 21.03 (Vernon 1977).

5. *Janecka,* 739 S.W.2d at 820.

view of the fact that appellant gave detailed accounts of how he strangled the deceased, he cannot successfully claim that he meets the *Adams* harm test. His first point of error is overruled.

In his sixth through eleventh points of error, appellant contends that his confessions were inadmissible as fruit of an illegal arrest and should have been suppressed. Appellant asserts that "for all intents and purposes," he was arrested without probable cause "at the police station" when he responded to the news that the victim's corpse had been discovered by stating that "he did not mean to hurt her."

The State asserts that appellant was not arrested, seized or even detained prior to being served with the arrest warrant. The State argues that appellant voluntarily came to the Tyler police station, voluntarily remained at the station, and voluntarily made various confessions before the police even realized that a crime had been committed and that appellant was the prime suspect.

The facts surrounding the arrest reveal that appellant contacted the Tyler police before the discovery of the victim's body, while the case was still only a "missing persons report." On November 20, 1990, appellant called the police station asking for "Detective Bill," apparently wanting to speak to Detective Bill Horton. He was inadvertently connected to Detective Bill Goecking. Appellant left a message for Horton and told Goecking that since he (i.e., appellant) was the last person seen with the missing girl, he did not want to get in trouble if she "came up hurt" and that he was eager to cooperate fully with the police to clear his name.

Early on November 21, 1990, appellant called Detective Horton and asked to meet at a restaurant at 10:00 a.m. Detectives Goecking and Horton met appellant at the restaurant. Horton emphasized during his testimony that the case had not yet developed into a homicide and that appellant was not even a suspect. During this meeting, appellant again stated that if anything had happened to the little girl, he had nothing to do with it.

Appellant agreed to meet the detectives later that afternoon to take a polygraph test at the police station. He asked for a ride to the station, and Detective Goecking agreed to pick appellant up at the restaurant. Detective Horton had previously arranged a search for the missing girl and was unavailable that afternoon.

When Detective Goecking returned at the appointed time, appellant stated that he was ready to go the police station but asked if Goecking could first take appellant's girlfriend to their home; they waited for her shift to end and then all three drove to the appellant's home in Goecking's unmarked vehicle. Appellant rode in the front seat. At the house, appellant got out of the car and spoke privately with a Mr. Cantley while Goecking spoke with another gentleman. In the course of the conversations, a passerby informed Cantley that a body had been found in the woods. Goecking unsuccessfully attempted to radio for more information.

When appellant had finished conversing with Mr. Cantley, Detective Goecking drove him to the police station and asked him to wait in an interview room. He then attempted to get more information but again was unsuccessful. Being senior homicide detective, Goecking was ordered to the scene by his chief. He took a picture of the missing girl from Detective Horton's desk and showed it to appellant. Pointing to the picture, Goecking stated, without knowing, "They just found her body. She's dead." Appellant began crying and said "Oh, no. I didn't mean to hurt her." Detective Goecking emphasized in his testimony that at this point he did not believe that he had probable cause to make an arrest—that appellant was free to leave the station. Goecking was again ordered to the scene; so, he left appellant with the first officer he found, Officer Danny Alexander.

Officer Alexander testified that he was ordered by Police Chief Bond to interview the witness waiting in the interview room, and that he did not consider appellant to be under arrest. After some small talk, Alexander asked about the missing girl. Appellant told him how he had sexual intercourse with her and then choked her to death. (This

statement was suppressed because no warnings had been given). Alexander informed Chief Bond of what appellant had said. Officer Alexander was informed by Detective Horton, who had returned from the scene, that the body was, in fact, that of the missing girl. Chief Bond told Officer Alexander to get a videotaped statement if appellant was willing. Appellant agreed to make a videotaped statement.

At the beginning of the videotaping, Officer Alexander advised appellant of his rights and asked appellant, "Are you under arrest?" Appellant responded, "I don't know." Alexander then explained to him that he was not under arrest and reminded him that he had voluntarily come to the police station. Upon completing the videotaped statement, appellant took a short break during which he went to the bathroom. At about 6:50 p.m., Alexander took a two-page statement from appellant after again advising him of his rights. The signing of this statement was witnessed by Detective Horton. Appellant was asked to wait in the interview room for a few minutes. Appellant was shortly thereafter served with an arrest warrant and placed under arrest.

A threshold issue before answering the question of whether there was an illegal arrest, is whether appellant was indeed "arrested" at any point prior to being served with the arrest warrant. *See, e.g., Shiflet v. State*, 732 S.W.2d 622, 623 (Tex.Crim.App. 1985). The trial judge found that the facts do not establish an arrest prior to the warrant. This finding should not be disturbed unless the record establishes a clear abuse of discretion. *Livingston v. State*, 739 S.W.2d 311 (Tex.Crim.App.1987), *cert. denied*, 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1987).

■ Article 15.22 of the Texas Code of Criminal Procedure states in pertinent part that "a person is arrested when he has been actually placed under restraint or taken into custody by an officer...." An arrest is complete when a person's liberty of movement is restricted or restrained. *Id.* at 327. For Fourth Amendment purposes, a person is "seized" only if, in view of all the circumstances surrounding the seizure, a reasonable person would have believed he was not free to leave. *E.g., Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

■ The facts of this case do not establish that appellant was in any way restricted or restrained in a manner that would invoke Fourth Amendment or Art. I, § 9 protections. There is a solid body of law, arising from facts analogous to those of the present case, holding that where the circumstances show that the person voluntarily accompanied the police in the investigation of a crime, and he knew or should have known that the police might suspect that he is implicated in the offense, whether he is acting upon the invitation, urging, or request of police officers, and not being forced, coerced or threatened, the act is voluntary and the person is not then in custody. *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *Dancy v. State*, 728 S.W.2d 772 (Tex. Crim.App.1987), *cert. denied*, 484 U.S. 975, 108 S.Ct. 485, 98 L.Ed.2d 484 (1987); *Livingston v. State*, 739 S.W.2d 311 (Tex.Crim.App. 1987); *Shiflet v. State*, 732 S.W.2d 622 (Tex. Crim.App.1985).

Appellant was never told or in any manner treated as if he were not free to leave. To the contrary, he was specifically told that he was not under arrest. Indeed, there is evidence that appellant sought the protective company of the police.[6]

The record establishes that appellant was a witness (arguably the prime suspect to a suspected but undiscovered crime) who voluntarily agreed to assist the police with the missing persons case. By coincidence, appellant was with the police while the crime itself was being discovered; he was told that the girl's body had been discovered (without that actually being known), and appellant spontaneously began crying and confessing *as the facts of the crime itself were being discover-*

---

6. Appellant had demonstrated some fear of the missing girl's family and friends, and had originally called the Tyler police department because "some men were chasing him." Appellant's mother was known by and friendly with numerous Tyler Police Department officers. Appellant stated that he trusted the police.

*ed.* He was advised of his rights and asked to give a statement; it was made clear to him that he was not under arrest. Appellant was treated wholly as a cooperating citizen and not as a detainee.[7]

Given the totality of the circumstances, we cannot conclude that the trial judge abused her discretion in finding that there was no arrest prior to that made with the arrest warrant and in overruling the motion to suppress, or in admitting the items into evidence at the trial. Appellant's sixth through eleventh points of error are overruled.

■■ The voluntariness of the videotaped and first two written confessions is challenged in appellant's twelfth through fourteenth points of error. Appellant contends that the videotaped confession and his first two written statements should have been suppressed as violating both the United States and Texas Constitutions because the police coerced him by depriving him of rest and food and because the officers induced him to confess by promising him that "everything would be all right." The State argues that appellant was neither induced by promise nor coerced by physical deprivations. We find appellant's contentions meritless and will affirm the trial court's findings.

The record reflects that during the videotaped confession appellant told Officer Alexander that he was feeling ill, but he did not request to terminate the taping or express any exhaustion or hunger. Later, while taking appellant to the Smith County Jail, Officer Alexander asked appellant about his illness. Appellant responded that he had not eaten since early the day before because he was so upset about what he had done. He stated that before meeting the detectives at the restaurant, he had tried to eat, but because he was feeling so bad about what had happened with the deceased, he could not eat. When appellant arrived at the Smith County Jail, Officer Alexander asked the jail personnel about getting appellant some food, but appellant spoke up saying he really didn't want any food. Appellant at no time directly asked for food.

The record reflects that appellant had the opportunity to sleep while in the county jail; whether he did so is not reflected in the record. The record further reflects that appellant was kept from sleep in part by his insistence on searching for the protractor and scalpel used to mutilate the deceased's body; he insisted on searching for them even though it was past midnight, stating that he wanted Officer Alexander and Detective Goecking to have them.

The inability to eat or sleep brought on by a man's own conscience is not the fault of the police. "Lack of sleep or food alone, will not render appellant's confession involuntary." *Johnson v. State*, 698 S.W.2d 154, 159 (Tex. Crim.App.1985), *cert. denied*, 479 U.S. 871, 107 S.Ct. 239, 93 L.Ed.2d 164 (1986).

■■ Appellant further urges that his confession was involuntary because it was induced by the promise that if he confessed "everything would be all right." The State denies that a promise was ever made.

The record reflects that during the videotaped confession, appellant began crying, to which Officer Alexander responded by stating, "Everything is going to be all right." Appellant responded "no." Officer Alexander reassured him saying, "It's all right to cry."

We disagree with appellant that the four-prong test formulated in *Fisher v. State*, 379 S.W.2d 900 (Tex.Crim.App.1964), to test the voluntariness of promise-induced confessions is applicable in this case. In its context Officer Alexander's statement cannot be construed as a promise. The cliche, "everything is going to be all right," particularly when accompanied with the words "[i]ts all right to cry," cannot be understood as an unequivocal conditional agreement; it does not denote the "if—then" relationship required to establish a promise. The police did not induce appellant to confess by implicitly or explicitly suggesting a "deal, bargain, agreement, exchange, or contingency" whereby they would make sure everything was going to be all

---

7. At what point the police had reasonable suspicion to detain or probable cause to arrest are academic questions, irrelevant in the face of a record that fails to demonstrate that appellant's freedom was restricted in any way.

right. *Freeman v. State*, 723 S.W.2d 727, 731 (Tex.Crim.App.1986).[8] Officer Alexander's response to appellant's anxiety was an attempt to ease his mind with the assurances of a cliche.

Appellant's twelfth, thirteenth, and fourteenth points of error are overruled.

Appellant argues in his fifteenth point of error that the trial judge erred in failing to suppress the statement taken from appellant on November 29, 1990.[9] This statement, according to appellant, fails to meet the requirements of Texas Code of Criminal Procedure Art. 38.22(2)(a).

Appellant apparently argues that because he was not given the proper statutory warning before making a statement on November 28, 1990, (that statement was suppressed), the subsequent statement made on November 29, 1990, should likewise be suppressed even though the statutory warnings were given and waived before that statement. Appellant fails to explain the contaminating connection between these two statements.[10]

The record establishes, and the trial judge's findings of fact reiterate, that prior to taking appellant's November 29th statement, the police officers read the statutory warnings to appellant and then asked to read them and to initial each warning to indicate that he understood and waived the rights expressed therein; appellant did so freely, intelligently, knowingly and voluntarily. Upon completing the statement, appellant was asked to read and sign it if it accurately reflected his oral statements; appellant did so. Appellant did not in this statement confess to extraneous offenses. Since appellant was given the warning prior to making the statement, whether he was given the warning prior to that time is irrelevant.[11]

Appellant's fifteenth point of error is overruled.

### III. Jury Selection

In his second, third, and fourth points of error appellant avers that three venirepersons were improperly excluded in violation of numerous provisions of the United States and Texas Constitutions.[12]

Appellant argues that Venirepersons Taylor, McGill, and Turman were dismissed in violation of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1986), and its progeny, because of their opposition to the death penalty. However, the record reflects that none of these venirepersons was opposed to the death penalty. The record instead reflects that they were properly dismissed on the grounds that their views prevented or substantially impaired the performance of their duties as jurors in accordance with the instructions given and the oaths taken. *See Nelson v. State*, 848 S.W.2d 126 (Tex.Crim.App.1992); *Cooks v. State*, 844 S.W.2d 697, 709 (Tex.Crim.App.1992), *citing*, *Jacobs v. State*, 787 S.W.2d 397 (Tex.Crim. App.1990).

---

8. *See also Jacobs v. State*, 787 S.W.2d 397 (Tex. Crim.App.1990), *cert. denied*, 498 U.S. 882, 111 S.Ct. 231, 112 L.Ed.2d 185 (1990).

9. Appellant announces in the point heading that the confession of November 23, 1990 is being challenged and then argues against his confession of November 29, 1990.

10. Appellant "concedes" that *Allridge v. State*, 762 S.W.2d 146 (Tex.Crim.App.1988), *cert. denied*, 489 U.S. 1040, 109 S.Ct. 1176, 103 L.Ed.2d 238 (1988), "would appear to decide this point against him." We fail to see how the facts or holdings of *Allridge* are analogous to appellant's case. Regarding Texas Code of Criminal Procedure Art. 38.22, *Allridge* holds that: 1) a defendant giving a statement about one offense need not be rewarned when he begins to confess to extraneous offenses and 2) at least where the officer knows that the defendant has been previously given Art. 38.22 warnings, the statute is satisfied if the defendant is given the warnings prior to signing, not just prior to giving, his statement. *Id.* at 158.

11. The record reflects that appellant had been given the statutory warnings at least four times previous to November 29, 1990 and that he had waived them in writing at least twice and on video once.

12. Appellant argues under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States and Article 1, §§ 10 and 19 of the Texas Constitutions. However, appellant's brief makes no arguments specific to the Texas Constitution; under *Johnson v. State*, 853 S.W.2d 527, 533 (Tex.Crim.App.1992), this Court declines "to pursue appellant's Texas Constitutional arguments for him." Only those arguments specifically briefed will be addressed.

In reviewing a trial court's decision to dismiss a venireperson upon a sustained challenge for cause, considerable deference is given to the trial judge because she is in the best position to evaluate the venirepersons; she benefits from observation of the venireperson's demeanor and responses while an appellate court has only the cold record. *Cantu v. State*, 842 S.W.2d 667, 681 (Tex.Crim.App.1992), *citing*, *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). When the potential juror's answers are vacillating, unclear or even contradictory, the trial judge's observation is particularly important. *Id.* at 682. In reviewing the trial judge's decision to sustain a challenge for cause, this Court asks whether the totality of the voir dire testimony supports the trial judge's finding "that the prospective juror is unable to take the requisite oath and follow the law as given by the trial judge," and only if a clear abuse of discretion is demonstrated will the trial judge's decision be reversed. *Id.*

Taylor was dismissed because her voir dire examination clearly demonstrated her inability to perform her duties as a juror. Seven times Taylor stated that even if the prosecution had proven the special issues under Art. 37.071(b) beyond a reasonable doubt she might nevertheless answer "no" so that a life sentence and not the death penalty might be imposed. We find no abuse of discretion in the trial court's dismissal of Taylor. *See Nelson*, 848 S.W.2d at 134. Appellant's second point of error is overruled.

The record establishes that McGill did not have problems with the death penalty, but like Taylor, she was uncertain about her ability to answer the special issues "yes" even if the evidence required that answer. McGill vacillated, saying that she thought she could answer "yes" to the special issues if the evidence required it but that she probably would answer "no" just to avoid the death sentence. McGill stated that living with the fact that she had something to do with sending someone to execution would probably be too much for her, that she would probably answer "no" against the evidence and avoid the life-long stress. The record supports the trial judge's conclusion that McGill would be unable to uphold the law and her jury oath. *Id.* Appellant's third point of error is overruled.

Appellant objects to the dismissal of venireperson T. Turman on the grounds that her excusal was improper. But the record reflects that trial judge was well within her discretion in excusing Turman for cause. Under examination Turman repeated several times that she would require proof greater than beyond a reasonable doubt before answering the special issues in the affirmative. She stated that she would require "certainty." She repeated under defense counsel's examination that her standard would be higher than reasonable doubt. It is a well established principle that a potential juror who will hold the State to a higher standard of proof than what the law requires may be dismissed for cause. *Cantu*, 842 S.W.2d at 682.

Appellant's second, third, and fourth points of error are overruled.

Appellant argues in his fifth point of error that the trial court erred in overruling his challenge for cause to venireperson Wilson. He argues that this resulted in the loss of a peremptory challenge which in turn forced him to accept venireperson Tucker as a juror.

The State concedes that the court erred in overruling the appellant's motion to strike venireperson Wilson for cause but argues that the error was harmless because the trial court recognized its error and granted appellant two additional peremptory challenges. This gave appellant a total of seventeen peremptory strikes all of which he exhausted.

When the trial court erroneously overrules a challenge against a venireperson, the defendant is harmed only if he uses a peremptory strike to remove the venireperson and thereafter suffers a detriment from the loss of the strike. *Demouchette v. State*, 731 S.W.2d 75, 83 (Tex.Crim.App.1986), *cert. denied*, 482 U.S. 920, 107 S.Ct. 3197, 96

L.Ed.2d 685 (1987).[13] Error is preserved for review by this Court only if appellant (1) used all of his peremptory strikes, (2) asked for and was refused additional peremptory strikes, and (3) was then forced to take an identified objectionable juror whom appellant would not otherwise have accepted had the trial court granted his challenge for cause (or granted him additional peremptory strikes so that he might strike the juror). *Id.*

■■■ The record reveals that appellant exhausted his fifteen statutory peremptory challenges, then requested and received two additional peremptory challenges. Appellant requested and was denied a third additional peremptory strike. Appellant identified juror J. Tucker as objectionable.

But, since appellant was granted two additional peremptory strikes, to demonstrate harm, i.e., reversible error, he must show that challenges for cause on at least three venirepersons were erroneously denied. *Martinez v. State,* 763 S.W.2d 413, 415 (Tex. Crim.App.1988). Appellant failed to establish reversible error because he alleges that only one of his challenges for cause was wrongly denied; any harm for this denial was cured by one of the extra peremptory strikes. Appellant's fifth point of error is overruled.

Points of error sixteen and seventeen voice appellant's contention that the trial judge erred in overruling his *Batson* objections to the State's use of its peremptory strikes. Appellant alleges the State struck potential African–American jurors solely because of their race in violation of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).[14] The State denies the use of any of its peremptory strikes on the basis of race.

■■■ In *Batson,* the Supreme Court outlined an analytical tool for testing the challenges to the State's use of peremptory strikes: Initially, the defendant must establish a *prima facie* showing that the State exercised its peremptory challenges on a basis of race. The burden then shifts to the State to articulate race-neutral explanations for its questioned strikes; the defendant may rebut these explanations. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful racial discrimination by the State. *Id.* at 106, 106 S.Ct. at 1728.

■■■ The State argues that appellant failed to establish a prima facie case. However, where the State fails at trial to object to the trial court's failure to rule on the defendant's *prima facie* case, that issue becomes moot and it cannot be raised on appeal. *See, e.g., Hill v. State,* 827 S.W.2d 860, 865 (Tex.Crim.App.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 297, 121 L.Ed.2d 221 (1992). In the case at bar, the trial court avoided ruling on the prima facie issue, but the State failed to object when asked to offer its explanations. The court then ruled, after hearing appellant's rebuttal, that there was no *Batson* error in the State's use of its peremptory challenges. The question of whether appellant established a prima facie case is moot.

■■■ We note that on appeal, the trial court's determination represents a finding of fact accorded great deference and will not be overturned unless clearly erroneous. *Adanandus v. State,* 866 S.W.2d 210, 224 (Tex. Crim.App.1993).[15] In applying this standard of review, a determination must be made as to whether the trial court's findings are supported by the record. This includes a review of the racial makeup of the venire, of the voir dire examination, of the prosecutor's explanations, and of appellant's rebuttal and impeaching evidence. *Id.*

Twenty-five African–Americans served on the venire in the present case. The State employed thirteen of its fifteen peremptory challenges; five of these were used to strike

---

13. *See also Jones v. State,* 833 S.W.2d 118, 123 (Tex.Crim.App.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1285, 122 L.Ed.2d 678.

14. Appellant does not argue that Tex.Crim.Proc. Code Ann. art. 35.261(a) (Vernon 1989) was violated by the State's peremptory challenges.

15. *See also Emerson v. State,* 851 S.W.2d 269, 273 (Tex.Crim.App.1993); *Cantu v. State,* 842 S.W.2d 667, 689 (Tex.Crim.App.1992).

African–Americans. Two seated jurors and both alternate jurors were African–Americans. Two African–Americans were struck for cause by appellant against the objections of the State.

■■■ At the trial court's *Batson* hearing, the State offered the following "race-neutral explanations" [16] for its five peremptory strikes against African–American venirepersons:

■■■ The State struck venireperson Cox because she was young, unemployed, had a brother with mental problems, and because she voiced aversion to the death penalty. The State explained that in their experience the unemployed and younger persons tend not to make good prosecution jurors in capital punishment cases. Her brother's mental status was important because she "might be more sympathetic to any mental health testimony on behalf of appellant." The State felt the combined force of these apprehensions warranted the use of a peremptory strike.

In rebuttal appellant points out that the State never questioned Cox "to determine whether or not her age or employment status would effect her ability to be a good juror." He argues that the lack of questioning regarding the effect of her age, employment, or her brother's condition demonstrates that the State's explanation was "a group bias where the group trait is not shown to apply to the challenged juror specifically." *Williams v. State* 804 S.W.2d 95, 96 (Tex.Crim.App.1991), *cert. denied,* —— U.S. ——, 111 S.Ct. 2875, 115 L.Ed.2d 1038 (1990).[17] Appellant points to no other evidence of race-based discrimination.

■■■ While it is true that the lack of questioning might expose the weakness of a State's explanation, the State is not required to ask a specified rubric of questions. In the instant case, the State suspected, because of the combined force of her youth, unemployment, and her brother's mental problems, that Cox would be inclined against the death penalty. The State's voir dire examination established the veracity of its apprehensions; Cox vacillated on the death penalty, stating initially, "I don't think I could vote for the death penalty." Then she stated that she could follow the law, but when again asked if she still felt she could not vote for the death penalty, she answered "Yes." The State was entitled to strike Cox based on her initial response. *See Esteves v. State,* 849 S.W.2d 822 (Tex.Crim.App.1993). The record supports the trial judge's finding that the State's explanation was racially neutral.

■■■ The State explained that it struck venireperson Mosley because her brother was serving a forty-year sentence for a felony prosecuted by same prosecutor in appellant's case, and because she vacillated on the death penalty issue. These are race-neutral explanations.

■■■ Again, appellant points out the State failure to question Mosley regarding her feeling about her brother's prosecution and holds this fact, without any other evidence, to demonstrate a *Batson* violation. Appellant misconstrues the case law.

In cases reversed because of the State's failure to establish the legitimacy of its explanations through voir dire questions, at least one of two other factors has existed 1) the legitimacy of the State's apprehension was not obvious [18] and 2) there was other

16. A "neutral explanation" is one based on something other than the race of the juror. "At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez v. New York,* 500 U.S. 352, ——, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991). Once the State provides racially neutral explanations,

 an issue of fact is joined which can only be resolved by an assessment of evidentiary weight and credibility. It is the burden of the accused to persuade the trial judge by a pre-

ponderance of the evidence that the allegations of purposeful discrimination are true in fact. *Tompkins v. State,* 774 S.W.2d 195, 202 (Tex. Crim.App.1987), *aff'd, Tompkins v. Texas,* 490 U.S. 754, 109 S.Ct. 2180, 104 L.Ed.2d 834 (1989).

17. *See also Keeton v. State,* 749 S.W.2d 861 (Tex. Crim.App.1988) (Keeton II).

18. *See United States v. Ratcliff,* 806 F.2d 1253 (5th Cir.1986) (Validity of Government's strike for inattentiveness was obvious where venireperson slept through voir dire), and compare to

evidence of disparate treatment. For example, in *Emerson v. State*, 851 S.W.2d 269, 272 (Tex.Crim.App.1993), the State struck an unemployed college student on grounds that the unemployment and the collegiate environment foment liberalism. The prosecutor asked no individual voir dire questions of the African–American venireperson "to confirm any of the liberal characteristics he associated with this type of person." *Id.* at 274. Moreover, there existed evidence of disparate treatment; the State claimed unemployment to be a factor in striking the African–American venireperson but failed to inquire about several non-black venirepersons' employment status even though they had left that portion of the questionnaire blank. *Id.*[19]

A brief comparison from *Esteves* and *Emerson* is also illustrative. In *Emerson* the State struck a potential juror, explaining that her brother was in the penitentiary; this Court held that an "appropriate race-neutral justification." 851 S.W.2d at 272. In *Esteves* the State struck a venireperson because her uncle was in the penitentiary; this Court ultimately held this explanation unconvincing because evidence of disparate treatment was introduced to rebut the facially legitimate explanation. 849 S.W.2d at 824. In *Esteves* the State had failed to strike a white venireperson whose nephew was also in the penitentiary. When asked to explain the disparity, the State argued that it had not challenged the white venireperson because he had indicated that he was not close to his nephew. But, this was countered with evidence that the State had questioned the black venireperson after the white and had never asked whether she was close to her uncle. *Id.* Thus, an apparently legitimate explanation was brought into scrutiny by evidence of disparate treatment.

The danger of seating a juror whose brother is a convicted felon, whom the State's attorney himself prosecuted, is obvious. Absent some other evidence which rebuts the State's race-neutral explanation, we will not disturb the trial court's finding that the State's explanation is legitimate, especially when the State's apprehension is so obviously legitimate.

■ Venireperson Kennedy was struck primarily because she worked with appellant's sister at Wal–Mart. The State was also concerned about her possible familial connection to Sheila Blaylock, a criminal defendant serving forty years for murder. Blaylock's family had rioted at the Smith County Courthouse after her sentencing, and carried a vocal grudge against the Smith County District Attorney's Office. Absent evidence of disparate treatment, we cannot find error in the trial court's assessment that this was a race-neutral use of the State's peremptory challenge.

■ The State struck venireperson Rider because he knew, and was apparently friendly with, appellant's mother. He had actually counseled appellant on several occasions. The connection between the families was such that appellant's grandmother and mother had nursed Rider's mother-in-law through an illness. Rider also indicated opposition to the death penalty. Moreover, Rider's brother was then under felony prosecution in Smith County. Without evidence of disparate treatment, the amicable association with the defendant's family was a sufficient race-neutral ground for striking venireperson Rider.

■ Venireperson Brown was struck because of her outright declaration during group voir dire that she would falsify her answers to the special issues to avoid a death sentence. On individual voir dire, she stated initially that she did not believe anyone had a right to take another's life and that she would feel guilty if she voted for the death penalty, but ultimately she agreed that she could perform her duties as a juror. The

*Daniels v. State*, 768 S.W.2d 314, 317 (Tex.App.—Tyler, 1988, pet. ref'd), (Inattentiveness was not obvious and should have been established through voir dire examination).

19. *See also Whitsey v. State*, 796 S.W.2d 707, 716 (Tex.Crim.App.1989) (the State struck a teacher because of its belief that teachers are generally liberal, but again the State failed to ask the venireperson any questions that would demonstrate her liberality. Buttressed by other evidence of disparate treatment, this was found to be an explanation contrived to avoid admitting acts of discrimination).

State believed that Brown was intimidated during individual voir dire, and would not then admit the true extent of her opposition to the death penalty. Absent some evidence of disparate treatment, we cannot find the State's strike to be anything but legitimate and race-neutral.

The trial judge, in the record, stressed her thorough attention to *Batson* concerns. Judge Kent stated that she was especially vigilant throughout voir dire, considering the questions and conduct of the State's counsel, "looking for any evidence, direct or circumstantial, of an intent by the state to discriminate." She stressed that "there was no difference in the State's tone of voice or actions or conduct toward veniremen because of their race." The only disparate treatment she noticed was based on the venireperson's position on the death penalty; the State's tone and approach differed toward those indicating antipathy or vacillation on the death penalty. The judge further found that the individual voir dire was detailed, and the questions "meaningful"—"to elicit the opinions of the venire members." The trial court found no evidence of race-based discrimination.

Appellant fails to present any specific argument substantiated by evidence that the State's racially neutral explanations belie a discriminatory scheme. In view of the State's clear, specific, and legitimate explanations, the trial court's painstaking findings, the record's strong support of the trial court's findings, and appellant's failure to formulate a convincing argument rebutting the State's facially neutral explanations, we must uphold the trial court.

Appellant's sixteenth and seventeenth points of error are overruled.

## IV. Trial on Merits

 Appellant contends in point of error eighteen that the trial court committed reversible error by not allowing him to impeach a State's witness with evidence of the State's favorable intervention in a pending criminal charge against him. Appellant argues that the United States Constitution's Confrontation Clause mandates that he be allowed to cross-examine any witness testifying against him to establish possible bias or self-interested motive. Appellant desired to cross-examine the witness regarding a letter sent by the State on his behalf to the Virginia traffic court judge handling his misdemeanor disorderly conduct. The letter requested merely continuance of a required appearance date because the witness was testifying in Texas on the same date, (State's Exhibit G). The State specified that no favorable treatment was sought or recommended:

> Please understand that we are not asking for any special favor in [the witness's] case. We ask only that you reschedule his summons for a later date.

The witness' testimony was not pivotal. His testimony concerned his and appellant's activities on the day of the offense. His most incriminating testimony was that appellant had revealed a scalpel which he claimed was for protection (presumably the same used to carve designs on the deceased's abdomen). On cross-examination, the witness testified that he was aware of a rumor implicating him in the rape and murder of the deceased, and that he was indeed eager to testify so that the truth would come out and his name cleared. He affirmed that the State had indeed paid for his travel and lodging expenses associated with his testifying at appellant's trial, but denied any coaching or promises of favor. Appellant was allowed to cross-examine the witness regarding a prior conviction for unlawfully carrying a firearm.

At trial appellant requested that he be allowed to impeach the witness with evidence of the State's intervention in his pending criminal charges in Virginia. Appellant presented no well-reasoned or specific argument supporting his request. He demonstrated no clear or even insinuated benefit that the State was attempting to gain for him, and no theory of a connection between this undefined "benefit" and the witness's testimony.

 While appellant correctly argues that great latitude should be allowed in cross-examining witnesses to reveal possible bias, prejudice, or self-interested motives to falsify testimony, it is likewise true that the burden of showing the relevance of particular evidence to the issue of bias rests on its

proponent. *Janecka v. State*, 739 S.W.2d 813, 830 (Tex.Crim.App.1987). Moreover, the parameters of cross-examination for the showing of bias rests on the sound discretion of the trial judge. *Id. See also Green v. State*, 676 S.W.2d 359, 363 (Tex.Crim.App. 1984). The trial judge must balance probative value against prejudicial risks, i.e., undue prejudice, embarrassment, harassment, confusion of the issues, and undue delay. *Green*, 676 S.W.2d at 363. The trial Court's determination is not reversible unless the appellant shows a clear abuse of discretion. *Johnson v. State*, 698 S.W.2d 154, 160 (Tex.Crim. App.1985), *cert. denied*, 479 U.S. 871, 107 S.Ct. 239, 93 L.Ed.2d 164 (1986).[20]

We cannot agree that the trial court abused its discretion. Appellant fails to explain how the State's letter demonstrated a benefit to the witness; the State demonstrated that it specifically did not intend for any benefit to be derived from the letter. Appellant's eighteenth point of error is overruled.

Appellant's nineteenth point asserts that the trial court erred by not allowing him to cross-examine Mr. Brooks regarding his membership in the street gang the "Crips." We need not reach the merits of appellant's claim, as he has failed to properly preserve error.

Rule 52(b) of the Rules of Appellate Procedure and Rule 103(a)(2) of the Rules of Criminal Evidence require that when evidence is excluded the proponent establish the substance of the excluded evidence by making on offer of proof. E.g., *Tatum v. State*, 798 S.W.2d 569, 571 (Tex.Crim.App.1990); *cf. Moosavi v. State*, 711 S.W.2d 53 (Tex.Crim. App.1986). Appellant wholly failed to explain why this evidence should have been permitted and what he hoped to establish with the evidence. His nineteenth point of error is overruled.

### V. Punishment

Appellant, in points of error twenty-tree and twenty-four, urges this Court to break with *stare decisis*, to reverse itself, and find that the trial court erred in failing to instruct the jury on the definition of "deliberately." Appellant acknowledges the trenchant case law holding jury instruction on the meaning of "deliberately" is unnecessary but urges that in view of the changes to Art. 37.071, the old article be clarified with a intelligible and mandatory definition of "deliberately."

We have consistently held that the trial court was not required to instruct the jury on the definition of "deliberately" and we are not prepared to readdress that issue at this time. *Zimmerman v. State*, 860 S.W.2d 89 (Tex.Crim.App.1993).[21] These points of error are overruled.

In his twenty-sixth and twenty-seventh point of error, appellant contends that the trial court erred in denying his requests for a *Penry* jury instruction and a special issue on mitigation evidence. *See Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). The State responds that no mitigating evidence requiring a *Penry* instruction was introduced. Appellant cites the following testimony offered by his mother as mitigating evidence requiring an instruction and special issue:

(a) Appellant's father was "never home" because he "ran around" and did a lot of things that she did not think he should be doing.

(b) Appellant's father had pinned him in a corner, blowing marijuana smoke in his face and she had hit the father to free appellant.

(c) Appellant lived in an atmosphere where violence toward women was common.

(d) Appellant resented his mother's remarriage.

(e) Appellant did not graduate from high school, going only through the 10th grade.

(f) Appellant attempted suicide at one time.

(g) Appellant had sought assistance from Texas Department of Mental Health and

---

20. *See also Montgomery v. State*, 810 S.W.2d 372, 378, 392 (Tex.Crim.App.1990) (elaborating on the meaning of abuse of discretion).

21. *See also Russell v. State*, 665 S.W.2d 771, 780 (Tex.Crim.App.1983), *cert. denied*, 465 U.S. 1073,

104 S.Ct. 1428, 79 L.Ed.2d 752 (1984); *Morin v. State*, 682 S.W.2d 265, 270 (Tex.Crim.App.1983).

Mental Retardation but had not received it.

(h) On one occasion, appellant almost froze to death after having been found face down on a Tyler street.

(i) Appellant has never been convicted of a felony.

His mother's testimony, largely about appellant's unhappy family life, is evidence properly considered under the second special issue of Art. 37.071, and requires no special instruction on mitigation evidence. In *Trevino v. State*, 815 S.W.2d 592, 622 (Tex.Crim. App.1991), *remanded on other grounds*, —— U.S. ——, 112 S.Ct. 1547, 118 L.Ed.2d 193 (1992), we specifically held that evidence of a turbulent family history does not necessitate a special *Penry* instruction.[22] Appellant's twenty-six and twenty-seventh points of error are overruled.

The judgment of the trial court is affirmed.

CLINTON, J., concurs in the result.

---

**22.** *See also Lewis v. State*, 815 S.W.2d 560, 567 (Tex.Crim.App.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1296, 117 L.Ed.2d 519 (1991).