

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-77,077

### WILLIAM MITCHELL HUDSON, Appellant

### v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL FROM CAUSE NO. 3CR-16-32585
### IN THE 3RD JUDICIAL DISTRICT COURT
### ANDERSON COUNTY

**WALKER, J., delivered the opinion for a unanimous Court.**

### O P I N I O N

In November 2017, a jury convicted Appellant of capital murder for murdering Carl and

Hannah Johnson in the same criminal transaction. *See* TEX. PENAL CODE § 19.03(a)(7). Pursuant to

the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071,

§§ 2(b) and 2(e), the trial judge sentenced Appellant to death. TEX. CODE CRIM. PROC. art. 37.071,

§ 2(g).[1] Direct appeal to this Court is automatic. Art. 37.071, § 2(h). Appellant raises two points of error. After reviewing Appellant's points of error, we find them to be without merit. Consequently, we affirm the trial court's judgment and sentence of death.

## I — Background

On Saturday, November 14, 2015, Tom Kamp; his adults sons, Nathan and Austin; Tom's girlfriend, Hannah Johnson; her six-year-old son, K.J.; and her parents, Carl and Cindy Johnson, arrived to camp on land Tom had bought in Anderson County. Tragically for the group, Appellant wanted and believed himself entitled to this same land. The property had been in Appellant's family for generations, but he was unable to buy it when it had been offered for sale.

Carl and Cindy arrived first at the property, towing an Airstream trailer. There was an unauthorized padlock on the gate. Using bolt cutters Tom had provided, they removed the padlock and entered the property. When their truck and the Airstream subsequently became stuck in the mud, Carl and Cindy had a loud argument. A man later identified as Appellant drove up to them; he was angry about the noise but then insisted that he would help them. Appellant, who lived on the adjacent property, left and returned shortly on a tractor. At about 4:30 p.m., while Appellant was freeing the truck and Airstream, Hannah, Nathan, Austin, and K.J. arrived in Tom's truck, towing a trailer with an ATV.

The group tried to pay Appellant for his help, but he refused money and said he would like to have a beer with them instead. As the group talked and Appellant learned that Carl and Cindy had cut the padlock off the gate, he became upset, calling the act "disrespectful." Appellant told them

---

[1] Unless otherwise indicated, all future references to Articles refer to the Code of Criminal Procedure.

that he had wanted to buy the land. Cindy and Carl apologized to Appellant for cutting the padlock, even though they did not think they needed to. Carl also tried to pacify Appellant by telling him that they were now friends and continuing to make conversation with him.

The family was sitting around the campfire when Tom arrived at about 8:00 p.m. in Hannah's car. Appellant was still with them. Later, although Hannah privately expressed a desire for Appellant to leave, Tom, Nathan, Austin, K.J., and Appellant got in the ATV together to collect more firewood. Cindy, Carl, and Hannah stayed behind to make dinner.

Cindy, Carl, and Hannah later heard gunshots but they thought it was just people "fooling around." Appellant eventually returned alone in the ATV and began talking to Carl. Meanwhile, Hannah saw something that alarmed her. She ran to Tom's truck, yelling for her father and pointing at the back of the ATV. Appellant then exited the ATV and began shooting at them.

Cindy survived the attack by hiding, but Appellant killed both Carl and Hannah. Hannah's body was discovered nude from the waist down. Although a sexual assault examination did not detect Appellant's DNA inside Hannah's body, DNA consistent with hers was detected on the crotch of Appellant's boxer shorts. A law enforcement dive team subsequently recovered Tom's, Nathan's, Austin's and K.J.'s bodies from a stock pond behind Appellant's residence. The medical examiner who conducted the six victims' autopsies testified that they died from injuries that included gunshot wounds and extreme blunt force trauma.

## II — Challenges for Cause

In points of error one and two, Appellant alleges that the trial court erred in denying his challenges for cause to veniremembers Brunson and Tountas. We first consider whether Appellant has shown that any such error could have harmed him. *See Comeaux v. State*, 445 S.W.3d 745, 747

(Tex. Crim. App. 2014) ("The issue . . . is one of harm, not preservation."); *Johnson v. State*, 43 S.W.3d 1, 5 n.6 (Tex. Crim. App. 2001) (stating that "[i]n the past we have confused preservation of error and harm issues within the context of an erroneous denial of a challenge for cause", and noting that the steps that courts have sometimes called necessary for preservation are really to show harm).

### II(A) — Potential Harm

"[H]arm from the erroneous denial of a defense challenge for cause focuses on whether a peremptory challenge was wrongfully taken from the defendant." *Newbury v. State*, 135 S.W.3d 22, 30–31 (Tex. Crim. App. 2004) (internal quotation marks and alterations omitted). Therefore, in addition to demonstrating error by the trial court, the appellant must show on the record that he complied with five steps:

> The first step requires the defendant to establish that he made a "clear and specific challenge for cause" against a panel member. This ensures that the defendant alerts the trial judge to the complaint at a time and in a manner in which it could be addressed. Then, the defendant must use a peremptory challenge on the complained-of member and exhaust all remaining peremptory challenges. If the defendant does not exhaust his peremptory strikes, then the trial judge's erroneous denial has not harmed the defendant because he was not stripped of the right to dismiss an "obnoxious" juror. The defendant must then ask for an additional strike so that the judge is given the opportunity to correct his error by granting an additional peremptory strike to make up for the one that was wrongly denied. Finally, the defendant must identify on the record the objectionable juror whom he would have removed with the additional strike, but he is not required to explain why that juror is objectionable.

*Comeaux*, 445 S.W.3d at 750 (internal footnotes omitted). We have explained that these steps "are intended to allow the trial judge every opportunity to correct error and to allow the defendant to demonstrate that he did not have the benefit of using his peremptory challenges in the way that he desired." *Id*.

Here, the record shows that Appellant made timely and specific challenges for cause to veniremembers Brunson and Tountas and the trial court denied those challenges. Individual questioning of the venire ultimately yielded forty-seven veniremembers whom the trial court deemed qualified to serve as jurors in a capital case. The parties then made their statutory peremptory challenges. *See* Art. 35.15(a) (allotting the parties in a capital case fifteen peremptory challenges each).

Appellant used his fourth and twelfth peremptory challenges to remove Brunson and Tountas from jury service. After the parties accepted the ninth juror, Appellant used his last remaining statutory peremptory challenge to remove another veniremember. The parties thereafter accepted the tenth and eleventh jurors. The State used its last two peremptory challenges to remove the next two veniremembers. When asked about the next veniremember for consideration, Livingston, defense counsel asserted and the trial court affirmed that the court had already granted Appellant an additional peremptory challenge. Appellant used this additional peremptory challenge to prevent veniremember Livingston from being seated on the jury.

The trial court stated that the next veniremember for consideration was Moreno and asked if either party wanted to be heard. Defense counsel responded: "Your Honor, we would again urge a motion for additional peremptory, due to the Court's ruling on our lodged motions for cause as tendered in the initial voir dire." Trial counsel did not state that Moreno was an objectionable juror or that counsel would use the requested additional peremptory challenge against her. The trial court denied the request and announced that Moreno would be the twelfth juror in the case.

On appeal, Appellant acknowledges that trial counsel did not follow the five-step procedure for showing harm that we have outlined in our case law because trial counsel did not specifically

identify Moreno as an objectionable juror. He nevertheless "contends that from reading the record as a whole, it is evident that the defense[,] after requesting an additional peremptory challenge which was denied[,] . . . would have exercised one peremptory challenge on the 12th juror that being Juror Moreno." Appellant therefore contends that he "preserved" his two claims concerning veniremembers Brunson and Tountas for appellate review.

We will assume without deciding that Appellant satisfied the preliminary steps for showing that harm could have resulted from the trial court's rulings on his challenges for cause to Brunson and Tountas. Because the trial court granted Appellant one additional peremptory challenge, to show reversible error, Appellant must demonstrate that the trial court should have removed both Brunson and Tountas for cause. *See Comeaux*, 445 S.W.3d at 749–50; *Chambers v. State*, 866 S.W.2d 9, 23 (Tex. Crim. App. 1993).

*II(B) — Law Applicable to the Merits*

A veniremember is challengeable for cause if the member has a bias or prejudice against the defendant or the law on which the State or the defendant is entitled to rely. Art. 35.16(a)(9), (b)(3), (c)(2); *see also Gardner v. State*, 306 S.W.3d 274, 295 (Tex. Crim. App. 2009). "The test is whether the bias or prejudice would substantially impair the prospective juror's ability to carry out his oath and follow instructions in accordance with the law." *Tracy v. State*, 597 S.W.3d 502, 512 (Tex. Crim. App. 2020); *see also Feldman v. State*, 71 S.W.3d 738, 744 (Tex. Crim. App. 2002). But, before a potential juror may be excused on this basis, the law must be explained to him and he must be asked whether he can follow the law regardless of his personal views. *Tracy*, 597 S.W.3d at 512. The challenger bears the burden of establishing that the challenge is proper. *Id.* The challenger does not meet this burden until he has shown that the veniremember understood the law's requirements

and could not overcome his prejudice well enough to follow the law. *Id.*

When reviewing a trial court's decision to deny a challenge for cause, we look to the entire record to determine whether sufficient evidence exists to support the court's ruling. *Davis v. State*, 329 S.W.3d 798, 807 (Tex. Crim. App. 2010). We reverse only for a clear abuse of discretion. *Id.* Because the trial judge is in the best position to evaluate a potential juror's demeanor and responses, we review a trial court's ruling on a challenge for cause with considerable deference. *Gardner*, 306 S.W.3d at 295–96; *see Burks v. State*, 876 S.W.2d 877, 893 (Tex. Crim. App. 1994) (stating that the trial judge is in the best position to determine whether a veniremember will set aside his views and honestly and truthfully follow the juror's oath). When a prospective juror's answers concerning his ability to follow the law are vacillating, equivocating, ambiguous, unclear, or contradictory, we accord particular deference to the trial court's decision. *Tracy*, 597 S.W.3d at 512; *Gardner*, 306 S.W.3d at 296.

*II(C) — Brunson*

Appellant alleges that Brunson was challengeable for cause because she would "implicitly place the burden of proof on the first special issue on [Appellant,] i.e. [she] would require defense evidence to establish that there was insufficient evidence regarding a probability that [Appellant] would commit criminal acts of violence and [constitute] a continuing threat to society[.]" In support, Appellant contends that Brunson stated that she "would have to have a doubt" not to impose the death penalty and expressed the belief that a death sentence is the default position after a jury convicts a defendant of capital murder. Appellant asserts that Brunson was therefore challengeable for cause because she was unable to follow the law requiring the State to prove the future dangerousness special issue beyond a reasonable doubt.

The record in its entirety does not support Appellant's contentions. The prosecutor explained to Brunson that the two possible punishments for capital murder are life in prison without parole or the death penalty. When asked whether she believed that "either one of those is an appropriate punishment, depending on whatever the facts and circumstances may be in a case," Brunson replied, "Yes, I do." The prosecutor noted that Brunson had expressed the same belief in her questionnaire, but had added that she did not like the expense of keeping someone in prison for such a long time. Brunson explained that this sentiment was "just kind of a side thing" and that she did not "think that's a deciding factor by any means." Brunson also said that it "make[s] sense" that, because the facts and circumstances can vary significantly from case to case, a jury is required to consider the full range of punishment.

When the prosecutor reached the future dangerousness special issue, she emphasized that the State has the burden of proving that special issue and the defense "[does not] have to prove to you anything on this one . . . . [W]e have to do the proving." Brunson agreed that this requirement made sense. Brunson also indicated that it made sense to her that the future dangerousness special issue was designed to remove a defendant "from the possibility of the death penalty" in the appropriate circumstances.

Brunson reiterated that she thought life without parole or death could be the appropriate punishment in a capital murder case, depending on the circumstances. Brunson acknowledged that she had commented on her questionnaire that the death penalty "should be used for any loss of life." But Brunson explained that she had meant that the death penalty should be "on the table" for offenses involving the loss of life. She indicated that she now understood that the death penalty was only an option for the offense of capital murder and that this was acceptable to her. At the end of the

State's questioning, Brunson affirmed that she could give both parties a fair trial and "just let the facts and circumstances and the evidence" guide her verdict and answers to the special issues.

Defense counsel next questioned Brunson. When counsel noted that Brunson had circled a questionnaire response indicating that she was a strong proponent of the death penalty, it prompted this exchange:

> Q.      Do you believe that the death penalty is the initial response to any taking of life in a criminal offense?
>
> **A.      No.**
>
> Q.      What is it that you strongly support then, in respect to the death penalty?
>
> **A.      I think the death penalty is a true punishment, and I think there are some offenses that I think need[] to be dealt with very harshly.**
>
> Q.      Using what you just said then, do you believe that life without parole is not a true punishment?
>
> **A.      I think there's some mercy in a life sentence vers[us] being put to death. I think it still gives the person a chance for redemption in their life.**
>
> Q.      But do you believe it's a true punishment?
>
> **A.      Yes, I do.**
>
> Q.      And you do understand life without parole, really means that? There's no out?
>
> **A.      That's what I understand it to mean.**
>
> . . . .
>
> Q.      Okay. Now, with respect to your -- and again, I'm not criticizing it or trying to say you're wrong in any respect. But with regard to your strong held belief in regards to the death penalty, in facing the issues that the State has shown you a potential juror would have to face at the end of the trial or during the course of trial, would you really have to be convinced though, with evidence, that death is not the appropriate punishment?

[Prosecutor]: What?

[Brunson]: I have to be convinced.

Q.      (By [Defense Counsel]) Okay.

A.      **I think I would have to have the doubts [sic].**

Q.      The doubt?

A.      **I guess the -- and that's, I think the question that they ask you over and over. You know, if there's anything in the back of your mind that's telling you that this person wasn't 100% responsible for what happened, or there weren't excuses for what happened, or something -- I'm not sure I'm answering your question.**

Q.      That's all right. You answered as -- from your mind and heart. You would have to have a doubt not to impose the death penalty, is that what you're telling me?

A.      **I guess that's what I'm saying.**

Q.      If I'm not phrasing it right, correct me, please. So –

A.      **Well, according to the questions and the -- the questions at the end, I mean, if you answer no to all those things, and it's really not in your hand -- I'm not stating myself correctly. I -- I'm not saying --**

Q.      Okay. Let's try this again. You understand that the issues that the State presents to you, other than the last touchy-feely mitigation question –

A.      **Okay.**

Q.      -- [have] to be proven to the jury, each and every individual, beyond a reasonable doubt?

A.      **Yes, I understand that.**

Q.      Okay. And the Defendant, other than the affirmative defenses of insanity or the issue of intellectual disability or defect, does not have any burden of proof whatsoever?

A.      **Right.**

Q.      Okay. You're good with that?

**A.      Yes.**

. . . .

Q.      What I'm asking is, your beliefs in regard to the death penalty, in essence, is the Defendant going to have to convince you that death should not be the response? Are you going to start with death is probably the most appropriate punishment first, and you'll have to be convinced otherwise?

**A.      No.**

(Emphasis in original).

Defense counsel acknowledged Brunson's response and moved to other subjects. Counsel thereafter challenged Brunson for cause, arguing among other things that she would "in essence reverse[] the burden of proof on the Defendant." The trial court denied the challenge.

The trial court did not abuse its discretion in denying Appellant's challenge for cause to Brunson. Brunson did not express the belief that death is the presumptively appropriate sentence for a person convicted of capital murder. She repeatedly expressed the belief that life without parole or death could be an appropriate sentence, depending on the evidence. She also expressly denied believing that the death penalty is "the initial response to any taking of life in a criminal offense[.]" Although Brunson told defense counsel that she "would have to have . . . doubts" when considering the special issues to find that death was not the appropriate punishment, her answers reasonably show that she was confused by counsel's line of questioning and had difficulty explaining what she was trying to say. When defense counsel clarified what he was asking, Brunson unequivocally stated, "no"—she would not require Appellant to convince her that "death should not be the response." Brunson also denied that she would begin her consideration of the punishment phase special issues

from the position "that death is probably the most appropriate punishment first, and [she would] have to be convinced otherwise."

At most, Brunson's answers were vacillating or contradictory. In such circumstances, we defer to the trial court's decision. *See Tracy*, 597 S.W.3d at 512. Point of error one is overruled.

*II(D) — Tountas*

In point of error two, Appellant asserts that the trial court should have removed Tountas for cause for the same reason it should have granted the challenge for cause to Brunson—Tountas would have allegedly "place[d] the burden of proof on the first special issue on [Appellant]." However, because Appellant received an additional peremptory challenge, he cannot demonstrate harm unless he shows that the trial court erroneously denied both of his challenges for cause to the two veniremembers at issue in points of error one and two. *See Chambers*, 866 S.W.2d at 23. We have reviewed Appellant's challenge for cause to one of those two potential jurors, Brunson, and found no trial court error. Accordingly, even if we assume that the trial court erred in denying Appellant's challenge for cause to the remaining veniremember at issue, Tountas, Appellant cannot show harm. *See id.* Point of error two is overruled.

We affirm the trial court's judgment and sentence of death.

Delivered: April 14, 2021
Publish