

# NUMBER 13-10-00151-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

| | |
|---|---|
| **THE STATE OF TEXAS,** | **Appellant,** |
| **v.** | |
| **JOHN ALANIZ,** | **Appellee.** |

### On appeal from the 148th District Court
### of Nueces County, Texas.

## MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Rodriguez and Benavides
### Memorandum Opinion by Chief Justice Valdez

Appellant, the State of Texas, appeals from an order granting a motion to suppress filed by appellee, John Alaniz. *See* TEX. CODE CRIM. PROC. ANN. art. 44.01(a)(5) (West Supp. 2010) (providing that the State is entitled to appeal an order granting a motion to suppress in a criminal case). By one issue, the State argues that the trial court abused its discretion when it granted Alaniz's motion without any evidence that an improper promise induced Alaniz to confess. We vacate the order and remand.

## I. BACKGROUND

Alaniz was charged by indictment with seventy counts of sexual assault of a child, a first-degree felony. *See* TEX. PENAL CODE ANN. § 21.011(a), (f) (West Supp. 2010). The State alleged that A.A., Alaniz's stepdaughter, had been sexually assaulted by Alaniz over the course of several years.[1] Alaniz filed a motion to suppress the confession he gave while being interrogated by Corpus Christi police officers. In his motion, Alaniz generally complained that "[o]fficers violated [his] constitutional safeguards and protections by coercing him to waive his rights and provide statements to them."

At the hearing on his motion to suppress, Alaniz testified that after he "had a lot of conversations with [O.G., his common-law wife and A.A.'s mother]" and had informed her of "everything that was happening," O.G. told him to talk with Detective James Lerma.[2] Alaniz went to the Corpus Christi Police Station on three different occasions to confess to the crimes alleged in the indictment. Alaniz testified that on the first two occasions he was asked to come back, and on the third occasion he had the following conversation with Detective Lerma:

---

[1] At the time of the hearing on Alaniz's motion to suppress, witnesses testified that A.A. was seventeen years old.

[2] At the hearing on the motion to suppress, O.G. testified that she contacted the police after A.A. told her about the alleged incidents. According to O.G., she spoke with Detective Lerma before Alaniz was interviewed and told him she was concerned "that if anybody mentioned [A.A.'s relationship to Alaniz], many people would know who this victim was." O.G. explained that, in response to her concerns about the media, "Detective Lerma mentioned that it would be easier if [Alaniz] came in and confessed, than them having to put out a warrant and go and—if he was wanted, basically, they would have to go look for him." O.G. testified that she then told Alaniz "that the police had mentioned about it being easier for him just to go in than them having to go look for him." O.G. continued, "I pictured that his face would be all over the T.V. and the newspaper if they had to go searching for him. He did not want to come in." Detective Lerma denied ever speaking to O.G. about media coverage surrounding this incident.

San Juana Adame, Alaniz's mother, also testified that Alaniz called her and told her that he wanted to turn himself in to avoid being arrested, having media coverage, and embarrassing the family.

2

I said, "I was told that I—if I come in and confess, that you guys wouldn't put me on the news, and I don't want to embarrass my family any[]more," and [Detective Lerma] said, "Yes." And I said, Are you sure?" And he said, "I guarantee it."

Subsequently, Detective Lerma interviewed Alaniz. The trial court admitted a DVD of that recorded interview for the limited purpose of the suppression hearing. Our review of the recording reveals that early in the interview, Alaniz informed Detective Lerma of the following: "I was told that once this happened that it's just not going to come out. It's not going to be broadcast. That they'll be O.K. Right?", to which Lerma responded, "They should be O.K. Yes, sir." Later in the interview, Alaniz explained that he and his son talked about what had happened, that Alaniz had stupid thoughts in his head, and that his wife told him that if he did those things that everything would come out. Alaniz further stated that "[w]e were told that if I came in and confessed, and I did, you'd try to keep it . . . quiet for everybody. I've done a lot to them. They don't deserve . . . all those things. They don't deserve to go through this." Lerma said, "O.K.", to Alaniz's comment. Near the end of the interview, when asked if there were any other victims, Alaniz said, "You thinking of dragging my sons into this?", to which Detective Lerma responded, "Absolutely not. Absolutely not. You've done the right thing by coming over here and telling us exactly what happened. The only thing is if you fail to tell us something, we have to go look for it and that's when we get anybody else involved."

At the suppression hearing, after viewing Alaniz's videotaped interview, the State asked Detective Lerma, "Okay. Let's talk about inducement or promises. Do you have any understanding as to what [Alaniz] meant by that on the tape?" Detective Lerma answered as follows:

3

[Alaniz] did ask me about the media and stuff like that. I told him that I wasn't in a position to grant him anything like that. I think that would be settled between his counsel and [Alaniz]. The police department nor myself were [sic] in any position to make those type of promises, but he did mention them to me.

Later, on cross-examination, when defense counsel asked Detective Lerma about media coverage, the following exchange occurred:

> Q. And not only did you get background information, but you also talked about potential media coverage [before the videotaped interview], correct?
>
> A. He asked me about it, yes, sir.
>
> Q. And you were aware that media coverage was important to him, correct?
>
> A. He asked about it. I'm assuming it was.
>
> Q. Okay. So he made it clear to you that it was important to him about not having any media coverage of this event, correct?
>
> A. Yes.
>
> Q. And are you telling this Court under oath that you made—in that out-of-court interview that you made no promises to him about media coverage?
>
> A. Yes, I'm telling you that, sir.
>
> . . . . .
>
> Q. Okay. And [it's] fair to say from watching [the taped interview], he had an impression that you told him it would not be broadcast?
>
> A. His concern was with the victim and that he wanted to make sure that she was okay, which I told him she was and that her name— there was not going to be media coverage involving the victim because victims of sexual assault and rape victims we do not usually issue their names to the media.
>
> Q. And he made it clear to you that keeping the victim's name out of the media was very important to him, correct?
>
> A. I believe so, yes, sir.

4

Q.    And you made the promise to him that you would keep the victim's name out of the media?

A.    Our department's policy is to leave the victim's name out of the media for the most part, yes, sir.  Even in our report we list them as "rape victims."

Q.    Okay.  But you made the promise to him to keep the victim's name out of—

. . . . .

A.    The victim, under my understanding, was going to be taken care of and that her name was not going to be in the media.

Q.    What was your response to his request that the victim stay out of the media, sir?

. . . . .

THE COURT:    . . . [T]hat the police department would keep the victim's name and identity and image out of the media?

[DEFENSE]:    That's the question.

A.    Yes.

Q.    And so it was promised to him that the police department would keep the victim's name out of the media?

A.    We try to [do] our very best to keep the victim's name out of the media, yes, sir.

THE COURT:    He articulated the department's policy, which is?

A.    To list sexual victims as "rape victims."

Q.    And did you—in this recorded interview did you ever tell him that's their policy?

A.    In the recorded video, no, sir.

Q.    Okay.  But you told him about the policy, the department policy before the recorded interview, correct?

5

A.    His concern was for the victim, and I told him, yes, we were going to do our very best to keep her out of the media.

Q.    Okay.  And you can see how that would be taken as a promise or guarantee by him?

. . . . .

A.    No, sir.

During closing arguments, counsel for Alaniz argued that Detective Lerma made two promises that induced Alaniz to confess:  (1) that "[w]e were going to do our very best to keep her out of the media"; and (2) that there would be no media coverage of the events.  In response, the State characterized Detective Lerma's statement to Alaniz regarding efforts to keep A.A.'s name out of the media as merely an expression of police policy and argued that "[s]tating mere policy that the police department always tries to keep the victim's name out is certainly not a promise"; "there was not any promise of anything."  The State also argued that even if Detective Lerma's statement was construed as a promise, it was not such that it would cause Alaniz to speak untruthfully.

After considering the evidence and arguments of counsel presented at the hearing, the trial court concluded, in open court, that there was insufficient evidence to find that Detective Lerma promised that either the detective or the police department would block media coverage of the event.  The trial court reasoned, however, that although Detective Lerma articulated department policy in a general way, when he testified, "I told him, yes, we were going to do our very best to keep her out of the media," his words focused on Alaniz's specific concerns about the victim.  The trial court continued, "I think . . . [this statement] goes beyond the articulation, the expression, the

6

explanation of department policy. I find that it was a promise on the part of the detective, that the promise taints the confession of [Alaniz]."

After orally granting the motion at the hearing, the trial court signed an order granting Alaniz's motion to suppress his oral confession and any evidence of such a confession. This appeal followed.

## II. STANDARD OF REVIEW

As an appellate court, we review a trial court's decision to admit or exclude evidence under an abuse of discretion. *See Green v. State*, 934 S.W.2d 92, 101-02 (Tex. Crim. App. 1996); *Montgomery v. State*, 810 S.W.2d 372, 379-80 (Tex. Crim. App. 1990) (en banc). We will reverse the judgment only if it is outside the zone of reasonable disagreement. *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006); *Montgomery*, 810 S.W.2d at 391.

In reviewing a trial court's ruling on a motion to suppress evidence, we use a bifurcated standard. *State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000) (en banc) (citing *Guzman v. State*, 955 S.W.2d 85, 88 (Tex. Crim. App. 1997) (en banc)); *see also Urbina v. State*, No. 13-08-00562-CR, 2010 Tex. App. LEXIS 6728, *3-7 (Tex. App.—Corpus Christi Aug. 19, 2010, pet. ref'd) (mem. op., not designated for publication). We give almost total deference to the trial court's findings of historical fact that are supported by the record and to mixed questions of law and fact that turn on an evaluation of credibility and demeanor. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007) (citing *Guzman*, 995 S.W.2d at 89). We "review de novo 'mixed questions of law and fact' that do not depend upon credibility and demeanor." *Id.* (quoting *Montanez v. State*, 195 S.W.3d 101, 107 (Tex. Crim. App. 2006)); *see Guzman*, 995 S.W.2d at 89.

"In reviewing a trial court's ruling on a motion to suppress, an appellate court must view the evidence in the light most favorable to the trial court's ruling." *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the trial court has not made a finding on a relevant fact, we imply the finding that supports the trial court's ruling, so long as it finds some support in the record. *Id.*

### III. APPLICABLE LAW

"A statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion . . . ." TEX. CODE CRIM. PROC. ANN. art. 38.21 (West 2005). "To decide this case the court of appeals must examine the totality of the circumstances surrounding the acquisition of the statement to determine whether it was given voluntarily." *Creager v. State*, 952 S.W.2d 852, 856-57 (Tex. Crim. App. 1997) (en banc).

"[F]or a promise to render a confession invalid under [a]rticle 38.21, the promise must be positive, made or sanctioned by someone in authority, and of such an influential nature that it would cause a defendant to speak untruthfully." *Martinez v. State*, 127 S.W.3d 792, 794 (Tex. Crim. App. 2004); *see Sossamon v. State*, 816 S.W.2d 340, 345 (Tex. Crim. App. 1991) (en banc), *abrogated on other grounds by Graham v. State*, 994 S.W.2d 651, 656 (Tex. Crim. App. 1999) (explaining that "an appellate court must look to whether the circumstances of the promises made the defendant 'inclined to admit a crime he had not committed'") (quoting *Fisher v. State*, 379 S.W.2d 900, 902 (Tex. Crim. App. 1964)); *Jacobs v. State*, 787 S.W.2d 397, 399 (Tex. Crim. App. 1990) (en banc) (citing *Fisher*, 379 S.W.2d at 902 (decided under former law set out in article 726)).

### IV. ANALYSIS

8

By its sole issue, the State contends that the trial court abused its discretion by granting Alaniz's motion to suppress without any evidence that an improper promise induced Alaniz to confess. The State challenges the trial court's finding that Detective Lerma's statement—"we were going to do our very best to keep her out of the media"—constituted a promise that tainted Alaniz's subsequent confession to the charged offenses.[3] The State argues, first, that the statement was not an improper promise and second, that even if Detective Lerma's statement about the police department's efforts to protect A.A. from media coverage was a promise, it neither induced Alaniz to confess nor depended upon his confession. As authority, the State cites *Chambers v. State* and *Renfro v. State*. *See Chambers*, 866 S.W.2d 9, 20-21 (Tex. Crim. App. 1993) (en banc); *Renfro*, 958 S.W.2d 880, 884 (Tex. App.—Texarkana 1997, pet. ref'd).

In *Chambers*, the court of criminal appeals rejected the contention that the police induced Chambers to confess to murdering an eleven-year-old girl by allegedly promising him that "everything would be all right" and telling him that "[i]t's all right to cry." 866 S.W.2d at 20-21. The court reasoned that the use of these clichés was only an innocuous attempt to ease the defendant's mind and anxiety and explained that "[t]he police did not induce appellant to confess by implicitly or explicitly suggesting a 'deal, bargain, agreement, exchange, or contingency' whereby they would make sure everything was going to be all right." *Id.* at 20-21 (quoting *Freeman v. State*, 723 S.W.2d 727, 731 (Tex. Crim. App. 1986) (en banc)).

In *Renfro*, the Texarkana Court of Appeals upheld the denial of a motion to suppress, rejecting the defendant's argument that his confession was coerced when a police officer told him that "it was possible that he could get some assistance with his

---

[3] The trial court also found insufficient evidence to substantiate a promise to block media coverage of the entire event. However, Alaniz does not challenge this finding by way of cross-appeal, and that issue is not before us. *See* TEX. R. APP. P. 47.1.

9

cocaine addiction." 958 S.W.2d at 883-84. The police officer admitted to making the statement but denied the statement was intended as a promise. *Id.* at 883. The court specifically noted that the police officer's statement did not "indicate the 'if-then' relationship required to establish a promise" and that the statement did "not rise to the level of an 'unequivocal conditional agreement' whereby in exchange for a confession [the police officer] would see to it that [the defendant] received drug treatment." *Id.* at 884 (quoting *Chambers*, 866 S.W.2d at 20).

In the present case, Detective Lerma testified that, during an unrecorded conversation, he told Alaniz that he was not in a position to grant him any requests or to make him any promises regarding media coverage. Detective Lerma testified on cross-examination that, before the interview, he explained to Alaniz that, pursuant to police policy, "there was not going to be media coverage involving the victim because [for] victims of sexual assault and rape victims we do not usually issue their names to the media." And when asked, "And you made the promise to him that you would keep the victim's name out of the media?", he responded, "Our department's policy is to leave the victim's name out of the media for the most part, yes, sir. Even in our report we list them as 'rape victims.'" Articulating police policy, as acknowledged by the trial court, Detective Lerma testified further that "[t]he victim, under my understanding, was going to be taken care of and that her name was not going to be in the media," and "[w]e try to do our very best to keep the victim's name out of the media." In response to counsel's question, "But you told him about the policy, the department policy before the recorded interview, correct?", Detective Lerma testified that he told Alaniz "we were going to do our very best to keep her out of the media." While acknowledging Alaniz's concern for

the victim, Detective Lerma testified that he could not see how Alaniz would have taken that as a promise or guarantee.

From our review of the totality of the circumstances, although we give "almost total deference" to the trial court's findings and view the evidence in the light most favorable to the trial court's ruling, in this case we conclude that the trial court's finding is not supported by the record. *See Amador*, 221 S.W.3d at 673; *Martinez*, 127 S.W.3d at 794; *see also Kelly*, 204 S.W.3d at 818; *Creager*, 952 S.W.2d at 856-57. Rather, the record supports a finding that Detective Lerma was explaining the policy of the police department to Alaniz, i.e., explaining how the department handled victims of alleged sexual assault. *See Chambers*, 866 S.W.2d at 20-21. The trial court was unreasonable in isolating Detective Lerma's one statement made while articulating department policy and in concluding that because the one statement focused on Alaniz's concerns about the victim, it was a promise on the part of the detective that rendered Alaniz's confession invalid. *See Martinez*, 127 S.W.3d at 794; *see also* TEX. CODE CRIM. PROC. ANN. art. 38.21. Therefore, we conclude that the trial court abused its discretion in this regard.

Furthermore, even assuming that Detective Lerma's statement was a promise, we agree with the State that there is no evidence that the promise induced Alaniz to confess or depended upon his confession. The court of criminal appeals has held that an "'if-then' relationship [is] required to establish [such] a promise." *Chambers*, 866 S.W.2d at 20-21 (quoting *Freeman*, 723 S.W.2d at 731). "[T]here must be some indication that the police "induce[d] appellant to confess by implicitly or explicitly suggesting a 'deal, bargain, agreement, exchange, or contingency.'" *Id.* (quoting *Freeman*, 723 S.W.2d at 731). In other words, it is a promise made in exchange for a

11

confession that is prohibited, not some free-standing promise untied to the decision to confess. *See Renfro*, 958 S.W.2d at 884 (setting out that no indication that the promise of drug treatment was given in exchange for a confession).

The evidence in this case does not support an "if-then" relationship. There is no evidence that Detective Lerma induced Alaniz to confess by implicitly or explicitly suggesting a "deal, bargain, agreement, exchange, or contingency. *See Chambers*, 866 S.W.2d at 20-21 (quoting *Freeman*, 723 S.W.2d at 731). The evidence simply does not support a conclusion that Detective Lerma's free-standing promise rose to the level of an "unequivocal conditional agreement." *See Renfro*, 958 S.W.2d at 884 (quoting *Chambers*, 866 S.W.2d at 20). Detective Lerma's single statement was not so positive that it tainted Alaniz's confession. *See Chambers*, 866 S.W.2d at 20-21; *Renfro*, 958 S.W.2d at 884. This specific statement lacked the persuasive impact needed to show that it would probably induce Alaniz to make an untruthful statement. *Compare Creager*, 952 S.W.2d at 856 (holding an officer's promise that he would try to obtain charitable help for defendant's wife and mother was not sufficient inducement to confess to a heinous crime); *Jacobs*, 787 S.W.2d at 400 (concluding that a promise to the defendant that he would be allowed to see his girlfriend was not sufficient inducement that it would likely cause him to confess); *Smith v. State*, 779 S.W.2d 417, 427-28 (Tex. Crim. App. 1989) (en banc) (finding that where the defendant wanted an opportunity to take a polygraph test to prove his innocence, and the police promised that he would be examined on a polygraph, the court stated, "we fail to perceive in what way a promise of a polygraph, without more, would operate to induce an accused falsely to inculpate himself."); *Salazar v. State*, 687 S.W.2d 502, 503-04 (Tex. App.—Dallas 1985, pet. ref'd) (holding that a promise of leniency toward other members of a theft ring was

12

unlikely to influence defendant to untruthfully confess to burglary) *with Pitts v. State*, 614 S.W.2d 142, 142-44 (Tex. Crim. App. 1981) (holding that a defendant's confession should be suppressed when, among other things, police promised appellant that if he helped clear "up any wrecking yard burglaries that he was involved in" and helped recover "all the property possible" then they would not file charges against him as a habitual criminal); *Tovar v. State*, 709 S.W.2d 25, 28-29 (Tex. App.—Corpus Christi 1986, no pet.) (concluding that a defendant's confession should be suppressed after police told him that if "he took the wrap . . . [then his pregnant wife] wouldn't be filed on").

Given the totality of the circumstances surrounding the acquisition of Alaniz's statement, *see Creager*, 952 S.W.2d at 856-57, we conclude that the trial court's implied determination that Detective Lerma's statement induced or coerced Alaniz to give a confession was outside the zone of reasonable disagreement. *See Dixon*, 206 S.W.3d at 590. Therefore, we conclude that the trial court abused its discretion in so determining.

Additionally, we cannot conclude that Detective Lerma's promise, if any, may have caused Alaniz's confession to be involuntary because Alaniz approached the detective for assurances that certain conditions would be met before he made his statement. As the court of criminal appeals noted in *Jacobs*, because the defendant "*cast himself in the role of entrepreneur*" and "acted in the role of a dealmaker our analysis is cast in a different light." 787 S.W.2d at 399-400. As in *Jacobs*, Alaniz cast himself in the role of a dealmaker diminishing his "ability to complain on appeal that he was 'influenced' or 'induced' to do anything." *Id.* at 400. Detective Lerma did not initiate the meeting that led to Alaniz's statement. Rather, Alaniz sought out Detective Lerma

13

and initiated the discussions about media coverage; Detective Lerma did not proffer any inducements that supplanted Alaniz as the instigator in that arrangement. *See id.* at 399-400.

Based on the foregoing, we sustain the State's sole issue.

**V. CONCLUSION**

We vacate the trial court's order granting Alaniz's motion to suppress and remand this cause to the trial court for further proceedings consistent with this opinion. Having disposed of the State's appeal, we hereby lift the stay of proceedings in the trial court, granted by this Court on April 1, 2010. *See* TEX. CODE CRIM. PROC. ANN. art. 44.01(a)(5), (e) (West Supp. 2010).

 

 

_____
ROGELIO VALDEZ
Chief Justice

Do not Publish.
TEX. R. APP. P. 47.2(b)
Delivered and filed the
20th day of October, 2011.

14