COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



ALBERTO ALVAREZ, A/K/A
ALBERTO ALVAREZ HERNANDEZ,

§

§

No. 08-11-00063-CR

Appellant,

§

Appeal from

v.

§

346th District Court

THE STATE OF TEXAS,

§

of El Paso County, Texas

§

Appellee.

§

(TC # 20080D01359)

## **O P I N I O N**

Alberto Alvarez was convicted of the felony offense of driving while intoxicated, third or more. A jury found him guilty as charged and assessed punishment at twenty-five years' confinement in the Texas Department of Criminal Justice-Institutional Division. The trial court entered judgment in accordance with the jury's verdict. For the reasons that follow, we affirm.

### **FACTUAL BACKGROUND**

On December 16, 2006 at approximately 6:30 p.m., Sergeant Raul Ramirez of the El Paso Police Department was driving southbound on Transmountain Road when he observed the vehicle directly in front of him turn onto Resler Drive. The driver of the vehicle, later identified as Appellant, struck a curb while making the turn. Sergeant Ramirez testified that Appellant hit the curb with his right-hand tires causing both of those tires to go up onto the curb before "kind of bouncing off." At that time, the officer turned on the video camera in his squad car and began

to follow Appellant. He followed for approximately two miles and during that time, Ramirez witnessed Appellant drive down the center of the road with his vehicle straddling the lanes. Appellant's vehicle was swerving from one lane to another without using a turn signal, which is a violation of state law. Sergeant Ramirez then activated his overhead lights, and Appellant pulled his vehicle over to the side of the street.

The officer approached Appellant's vehicle, identified himself, and asked Appellant for his license and proof of insurance. Appellant provided both documents. At that time, Sergeant Ramirez noticed an open bottle of Bud Light between Appellant's legs. As Appellant leaned over to get his proof of insurance from the glove box, he spilled the beer on himself. Appellant then placed the beer bottle on the front floorboard. Although the stop occurred at night, Appellant was wearing dark prescription sunglasses. The officer smelled the odor of alcohol coming from the vehicle, and noticed that Appellant's eyes were bloodshot and that he was slurring his speech. Sergeant Ramirez then asked Appellant to step out of the vehicle. Appellant complied and Sergeant Ramirez escorted him to the rear of the vehicle. Appellant was "very sluggish, very slow, lethargic almost." His pants were wet from the spilled beer and he was "kind of dirty and unkempt." Once Appellant was out of his vehicle, Sergeant Ramirez asked Appellant where he was coming from and if he had been drinking. Appellant answered that he had been drinking and that he was coming from his sister's house.[1] Since Sergeant Ramirez was not certified to administer standard field sobriety tests, he radioed for assistance from an officer trained to administer such tests. Approximately twenty-five minutes later, Officer Amanda Vega arrived on the scene. Officer Vega testified that she responded to Sergeant Ramirez's call for

---

[1] Sergeant Ramirez testified that Appellant said he was traveling from his sister's house in the northeast to his own house. Based on Appellant's driver's license, Sergeant Ramirez knew that Appellant's residence was in the valley. Sergeant Ramirez asked Appellant why (if he was going from a house to a house in the valley) he was on the west side of town. According to Sergeant Ramirez, Appellant simply repeated that he was going home.

assistance at approximately 6:45 p.m. She was certified to administer standardized field sobriety tests. She also noticed that Appellant was wearing sunglasses in the dark, that he smelled of alcohol, and that he was slurring his speech. She then proceeded to perform the standardized field sobriety tests. There were no problems with the surface on which the test was performed; it was a flat, even surface. The lighting on the street was adequate and she did not recall any wind.

Before performing the tests, Officer Vega explained to Appellant that there are three standardized field sobriety tests: the horizontal gaze nystagmus (HGN) test, the walk-and-turn, and the one-leg stand. She demonstrated the tests to Appellant and then asked him to perform them. The officer began by asking Appellant if he had any head injuries. Appellant responded that he had an injury to his right calf. Officer Vega proceeded with the HGN test. After testifying in detail about the process, Officer Vega concluded that Appellant displayed six out of six clues indicating intoxication.

The second test was the walk-and-turn. Appellant presented five out of eight clues on this test. Finally, Officer Vega conducted the one-leg stand test. Because of Appellant's right leg injury, she asked him to lift his right leg and put his weight on his left leg. Appellant responded "okay" and then attempted the test. But the officer became concerned that Appellant may fall and she stopped the testing for his safety. As a result of her observations, Officer Vega concluded that Appellant was intoxicated. Appellant was then placed under arrest and transported to the Westside Regional Command Center where Officer Vega read Appellant his *Miranda* warnings. Appellant was asked to provide a breath sample and he agreed. Officer Oscar Acosta took the breath sample. He had completed a course of instruction for the breath intoxilyzer machine (the Intoxilyzer 5000). He testified that he was certified to operate the Intoxilyzer 5000 and had done so over fifty times.

Prior to administering the test, Acosta observed Appellant for fifteen minutes. This observation period ensured Appellant did not place anything in his mouth that would interfere with the testing results. There were no problems with administering the tests.

Ralph Tamez, a technical supervisor in the breath testing section of the El Paso Police Laboratory, also testified. Tamez was responsible for performing maintenance on the breath intoxilyzer machines and for ensuring that breath tests were done in accordance with the Department of Public Safety's regulations. Two breath tests were administered to Appellant. The results of the tests were 0.170 and 0.173. Tamez testified that the legal limit for blood alcohol content is 0.080.

### PROCEDURAL HISTORY

On March 25, 2008, Appellant was charged by indictment with the felony offense of driving while intoxicated, third or more. To enhance the charge to a felony, the indictment included an enhancement paragraph alleging Appellant was previously convicted of two misdemeanor DWIs, one in 1990 (Cause No. 900C11643) and one in 1993 (Cause No. 930C06823) Additionally, the indictment included two separate enhancement/habitualization paragraphs wherein the State alleged that Appellant had previously been convicted in of two felony offenses and that both convictions became final prior to the commission of the current offense. Specifically, the enhancement/habitualization paragraphs alleged that: (1) in 1998 Appellant was convicted in of a felony DWI in Cause No. 970D6702; and (2) in 1983 Appellant was convicted of the felony offense of unlawful delivery of marihuana.

### Pretrial Motion to Quash

On May 20, 2008, Appellant filed a motion to quash the enhancement/habitualization paragraph related to his 1998 felony DWI conviction as contained in the indictment. According

- 4 -

to Appellant, the 1998 judgment in the felony DWI case was void because Assistant District Attorney, Jim Callan, represented Appellant in his 1993 DWI conviction and then prosecuted Appellant for the 1998 felony offense in which the 1993 conviction was used as one of the enhancement paragraphs. Appellant asserts that Callan's conflict of interest rendered his guilty plea in the 1998 felony DWI case involuntary, "constitutes a due process violation, overcomes the presumption of normalcy, and renders the enhancement paragraph void." On February 11, 2010, the trial court held a hearing on Appellant's motion to quash. She asked both parties to submit written arguments with supporting case law no later than February 26, 2011. No order either granting or denying Appellant's motion to quash appears in the record.

## Pretrial Motion to Suppress

Appellant also filed a pretrial motion to suppress evidence on May 20, 2008. The trial court conducted a hearing and filed Findings of Fact and Conclusions of Law. She issued an order denying the motion and the case then proceeded to a jury trial.

## Jury Trial

Jury selection began on January 7, 2011. During voir dire, Appellant challenged four prospective jurors for cause. The trial court denied all four challenges. Appellant then used a peremptory strike to remove each of the jurors. After each challenge was denied, Appellant requested an additional peremptory strike. The trial court denied Appellant's first three requests for additional peremptory strikes but, after denying Appellant's fourth challenge for cause, the trial judge did grant Appellant one additional peremptory strike. Appellant exhausted all of his peremptory strikes. Once the jury was selected Appellant informed the court that three objectionable jurors remained on the panel. Appellant then renewed his request for additional peremptory strikes. His requests were again denied.

On January 10 and 11, 2011, the case was tried to the jury. The majority of the testimony the jury heard from the witnesses is outlined in the factual background above. However, as part of the State's case it also had to prove that Appellant had been previously convicted of two DWIs. To do so, the State called fingerprint expert Dale Fernandez to testify.[2] Fernandez worked as an investigator with the District Attorney's Office and had completed basic and advanced fingerprint investigation courses conducted by the FBI. Over Appellant's objection, the trial court accepted Fernandez as an expert in fingerprint identification.

The State provided Fernandez with copies of two prior judgments, marked as State's Exhibits 12 and 13, as well as a fingerprint card marked as State's Exhibit 14. Fernandez recognized State's Exhibits 12 and 13 as copies of judgments with fingerprint impressions on the bottom. He also recognized State's Exhibit 14 and identified it as a fingerprint card of Appellant's fingerprints which he had taken forty-five minutes earlier. Fernandez compared the fingerprints on each of the judgments to those on the fingerprint card, and confirmed that the prints on each of the judgments matched the right index fingerprint on the card. Therefore, he concluded that the prints on each of the judgments marked as State's Exhibits 12 and 13 belonged to Appellant.

## MOTION TO QUASH

In Issue One, Appellant complains that the trial court erred in denying his motion to quash the habitualization paragraphs contained in the indictment. The indictment contained an enhancement paragraph and a habitualization paragraph. The enhancement paragraph alleged

---

[2] Before Dale Fernandez testified, outside the presence of the jury defense counsel was allowed to take the witness on voir dire. Fernandez testified that he created a finger print card of Appellant's fingerprints on the day of trial and that the fingerprint on the card was identical to the right index fingerprints both the judgment marked as State's Exhibit 12 and that marked as State's Exhibit 13. Appellant then objected to State's Exhibit 12 and State's Exhibit 13 because the fingerprints on those judgments were not thumbprints. Appellant argued that Article 38.33 of the Texas Code of Criminal Procedure requires thumbprints. The trial court denied the objection.

Appellant had been convicted of two prior misdemeanor DWIs, one in 1990 and one in 1993. These two misdemeanor offenses were used by the State to enhance Appellant's current DWI charge to a felony offense. In a separate enhancement/habitualization paragraph the State alleged Appellant was convicted of a prior felony DWI in 1998. It is undisputed the 1990 and 1993 misdemeanor DWIs were also used to enhance the 1998 DWI offense to a felony. It is also undisputed that Appellant was represented by Jim Callan when he pled guilty to his second misdemeanor DWI offense in 1993. Callan later joined the office of the district attorney, and when Appellant pled guilty to the 1998 felony DWI offense, Callan was the prosecutor for the State.

On appeal, Appellant argues that Callan's involvement is a "huge conflict of interest [which] resulted in Appellant being denied his due process rights under the 14th Amendment of the United States Constitution and Art. I, Sec. 19 of the Texas Constitution." He contends the trial court abused its discretion in refusing to throw out both the 1993 misdemeanor DWI offense and the 1998 felony DWI offense in which Callan was involved. Appellant has waived this issue.

To preserve a complaint for appellate review, the complaining party must make a timely, specific objection and must obtain an adverse ruling from the trial court. TEX.R.APP.P. 33.1. Appellant filed a pretrial motion to quash on May 20, 2008. On February 11, 2010, the trial court held a hearing on the motion. At the conclusion of the hearing, the judge announced that she would allow the parties until February 26, 2010 to submit memorandums and proposed orders on their arguments. The judge also stated that she would give her decision on the motion to quash "at that time." However, nothing in the record indicates that the trial court ever ruled on

the motion.[3] TEX.R.APP.P. 33.1(a)(2); *see also Ruston v. State*, Nos. 05-02-00854-CR, 05-02-00855-CR, 2004 WL 205726, at *1 (Tex.App.--Dallas Feb. 4, 2004, no pet.)(mem. op.)(noting that "as a prerequisite to presenting a complaint for appellate review, the record must show that the trial court ruled on appellant's motion or refused to rule on the motion and appellant objected to the refusal.")

Absent an adverse ruling of the trial court which appears in the record, there is no preservation of error. *See Brosky v. State*, 915 S.W.2d 120, 129 (Tex.App.--Fort Worth 1996, pet. ref'd), *quoting Darty v. State*, 709 S.W.2d 652, 655 (Tex.Crim.App. 1986); *see also Ramirez v. State*, 815 S.W.2d 636, 643 (Tex.Crim.App. 1991)(holding that error was waived where there was no definite or adverse ruling on a complaint). Such is the case here. *See* TEX.R.APP.P. 33.1(a)(2); *see also Prince v. State*, 137 S. W.3d 886, 888 (Tex.App.--Houston [1st Dist.] 2004, no pet.)(any error regarding the trial court's refusal to grant three motions to quash information was waived where defendant failed to secure an adverse ruling on the motions). We overrule Issue One.

### MOTION TO SUPPRESS

In Issue Two, Appellant challenges the trial court's denial of his motion to suppress the evidence obtained as a result of the field sobriety tests and the breath intoxilyzer tests. We review a trial court's order on a motion to suppress under a bifurcated standard of review. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App. 1997). "As a general rule, appellate courts view the evidence in the light most favorable to the trial judge's ruling, regardless of whether the judge granted or denied the suppression motion." *State v. Woodard*, 341 S.W.3d 404, 410

---

[3] Likewise, nothing in the record indicates that the trial judge refused to rule on the motion and that Appellant objected to the refusal. The parties proceeded to a trial on the merits on the original indictment containing the habitualization paragraphs.

(Tex.Crim.App. 2011), *citing State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex.Crim.App. 2008) *and Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex.Crim.App. 2007). We afford almost total deference to the trial judge's determination of facts so long as such facts are supported by the record. *Gonzales v. State*, 369 S.W.3d 851, 854 (Tex.Crim.App. 2012), *citing Guzman*, 955 S.W.2d at 89. Thus, we afford the prevailing party "the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence." *Garcia-Cantu*, 253 S.W.3d at 241. We also afford almost total deference to a trial court's ruling on mixed questions of law and fact that depend upon an evaluation of credibility and demeanor. However, if credibility and demeanor are irrelevant to a trial court's evaluation, we review the trial court's ruling *de novo*. *Woodard*, 341 S.W.3d at 410. All purely legal questions and questions involving application of established facts to legal principles are reviewed *de novo*. *Gonzales*, 369 S.W.3d at 854; *Woodard*, 341 S.W.3d at 410; *Kothe v. State*, 152 S.W.3d 54, 63 (Tex.Crim.App. 2004).

On appeal, Appellant claims the trial court erred by failing to suppress evidence of the field sobriety tests and the breath intoxilyzer tests. With respect to the field sobriety tests, Appellant asserts that because the officer forced him to perform the tests despite being told of a leg injury, the evidence obtained as a result of those tests is inadmissible. Specifically, Appellant contends that the field sobriety test manual provides that people with leg injuries should not be asked to perform the one-leg stand or walk-and-turn. As such, Appellant complains that the results of those tests were invalid and should have been suppressed. With respect to the results of the breathalyzer test, Appellant contends that the trial court abused its discretion in failing to suppress the results because the delay of approximately four hours between the traffic stop and the administration of the breathalyzer test means the results of the test cannot serve as evidence

that he was intoxicated at the time he was operating the vehicle.

At the suppression hearing, the trial court began by asking defense counsel for a "brief opening so I know where we're at."[4]  Counsel responded in part by stating that the evidence obtained as a result of the field sobriety tests should have been suppressed because Appellant was forced to perform the tests even after he informed the officer he had a leg injury.  Counsel also argued that the trial court should suppress the results of his breath intoxilyzer tests.  At the hearing, Appellant claimed that the breath testing was invalid because the observation period was not exercised.[5]

After the hearing, the trial court denied Appellant's motion and issued the following findings of fact and conclusions of law:

### I.  Findings of Fact

1.  On 12/15/2006 at about 6:31 P.M., Officer Raul Ramirez was driving on Transmountain approaching Resler.

2.  The Officer observed the Defendant, Alberto Alvarez take a left turn to Resler where he observed the Defendant's car strike the concrete curb with his two right side tires and then drifted into the left hand lane

3.  Officer Ramirez then activated his dashboard camera and continued to follow the Defendant with no overhead lights.

4.  Officer Raul Ramirez continued to observe and follow the Defendant wherein he observed the Defendant continued to drive and failed to maintain a single lane by driving into the center lane, swerving between the center lane and the left lane,

---

[4]  Of note, Appellant's written motion makes no mention of his leg injury affecting the field sobriety tests.  The only statement specifically related to the field sobriety tests states, "The Defendant did not intelligently, voluntarily, and knowingly consent to the taking of a field sobriety test."  Likewise, the written motion to suppress focuses on a "blood specimen" rather than the breath tests and contains only a single paragraph specifically referencing a "breath test."  However, the testimony at the hearing on the motion to suppress was on the breathalyzer tests, and there was no testimony or evidence related to a blood specimen introduced at the motion to suppress hearing or at trial.

[5]  The hearing then continued by addressing the issues as specified in Appellant's opening remarks, i.e. the effect of Appellant's leg injury on the validity of the field sobriety tests and the administration of the breathalyzer test.  No one at the hearing ever acknowledged the apparent disconnect between the issues Appellant presented at the hearing and those specified in his written motion to suppress.

and back again, all without making an effort to signal his intent to switch lanes.

5.  After about 1 1/2 miles, at approximately the 1400 block of Resler, Officer Ramirez stopped the Defendant and requested the Defendant's driver's license, registration and insurance.

6.  Officer Ramirez immediately noticed the smell of alcohol; the Defendant to be slouched, slurring and mumbling.

7.  Officer Ramirez asked the Defendant where he was coming from and if he had been drinking. The Defendant stated that he had visited his sister in the Northeast side of town and that he was going to visit his brother in the Eastside of town.

8.  Officer Ramirez also noticed the odor of alcohol from his breath, blood shot eyes, and also noticed an open container of beer on his lap.

9.  That Officer Ramirez then called a DWI Step Unit for assistance and Officer Amanda Vega, a certified SFST practitioner, responded to the scene.

10.  That Officer Vega examined the Defendant for clues of intoxication.

11.  The Defendant performed the Standard Field Sobriety Tests at the request of Officer Vega and failed these tests with the following results:  HGN 6/6, Walk & Turn 8/8, and the One Leg Stand was stopped due to safety concerns for Alberto Alvarez who was unable to safely perform the test.

12.  The Defendant, Alberto Alvarez was then placed under arrest for the offense of Driving While Intoxicated, was read his Miranda warnings, and was read the DIC 23, 24, and 25 warnings and asked to provide a breath sample.

13.  The Defendant, Alberto Alvarez also consented to provide a breath sample.

14.  Officer Oscar Acosta, a certified Intoxilizer 5000 operator, then properly conducted the breathalyzer exam on the Defendant, Alberto Alvarez which results were 0.170 and 0.173.

15.  Officer Acosta testified that he observed the Defendant for 15 minutes before the test and noticed that the Defendant's speech was slurred, that he smelled of alcohol and had an unsteady balance.

## II.  Conclusions of Law

1.  The Defendant, Alberto Alvarez violated Texas Transportation Code sections 545.104 (Signaling Turns; Use of Turn Signals), 545.060 (Driving on a Roadway Lane for Traffic), and 454.063 (Driving on a Divided Highway) when he was pulled over.

- 11 -

2. That in the same manner specifically, the Defendant Alberto Alvarez was driving in a manner that was a danger to himself and other drivers; by striking the curb leading to the pedestrian sidewalk and swerving in between lanes of traffic while other vehicles were in the vicinity.

3. That the stop conducted by Officer Ramirez of the Defendant, Alberto Alvarez was lawful and proper.

4. That Alberto Alvarez's failure of the SFSTs and the facts of Alberto Alvarez's stop provided Officer Ramirez with probable cause to arrest Alberto Alvarez for the offense of Driving While Intoxicated.

5. That the Standard Field Sobriety Tests were properly performed by Officer Vega, according to NHTS Standards.

6. That the Intoxilizer test was properly administered by Officer Acosta.

7. That the Defendant failed the Intoxilizer test.

8. That all evidence seized from the Defendant was legally obtained.

9. That the [sic] all statements made by the Defendant were pre-custodial or were not the product of interrogation.

Initially, we note that Appellant does not challenge the trial court's findings of fact or conclusions of law regarding the legality of Sergeant Ramirez's initial traffic stop (based on Appellant's violation of traffic laws), or the officer's probable cause to arrest Appellant. Instead, he specifies only two grounds to support his conclusion that the trial court abused its discretion in denying his motion to suppress. First, he complains that the evidence obtained as a result of the field sobriety tests was improperly obtained because of his leg injury. Second, he contends that his breath samples were improperly obtained due to the length of the time period between the traffic stop and the administration of the tests, and therefore the trial court erred in refusing to suppress the results.

**Field Sobriety Tests**

Officer Vega testified that she was certified to administer field sobriety tests and detailed

- 12 -

her training and experience. On the night in question, she performed the standard three tests on Appellant: HGN, walk-and-turn, and one-leg stand. Prior to conducting the HGN test, she asked Appellant if he had any head injuries. Appellant responded that he had a bad right leg and lifted the right leg of his pants.[6] Officer Vega observed the injury to Appellant's calf and then proceeded with the HGN test. She then moved on to the walk-and-turn test. Officer Vega testified that the tests were all performed on a smooth flat surface and that nothing about the weather or the lighting interfered with the testing. She also testified that Appellant's leg injury did not appear to prevent him from performing the walk-and-turn test. Finally, Officer Vega conducted the one-leg stand test. She gave Appellant a choice of which leg to lift. She could not recall whether Appellant mentioned anything about his leg injury at that point which would prevent him from performing the one-leg-stand test, but he "attempted to perform the test." Since Appellant's right leg was injured, he put his weight on his left leg. He continually raised his hands and put his foot down saying, "Well my leg. It's my leg." Vega responded, "You said it was your right leg, and you're on your left leg." At that point, she decided to stop the test for Appellant's own safety. Cross examination ensued:

> Q. [BY APPELLANT'S COUNSEL]: And basically in your training for the DWI standard field sobriety test there's some instructions on how those tests should be performed?

> A. [BY OFFICER VEGA]: Yes, sir.

> .    .    .

> Q. When you're going to perform the walk-and-turn test or the one leg stand, isn't it true that the manual says that you're to ask the individual if they have any injuries?

> A. I don't recall that part of the manual, sir. I know I asked. Yes, I do ask, yes.

---

[6] Appellant later answered Officer Vega's initial question by telling her he did not have any head injuries.

.    .    .

Q. And if they have injuries, do you still have them perform the test?

A. I ask them if it's going to affect their ability, they don't think they can do it, I have them try it.

.    .    .

Q. You ask a person if they're injured, and you ask them to go ahead and try them even though they are injured?

A. Depending on their injuries.

Q. You testified specifically in this case that you asked [Appellant] if he had any injuries?

A. If he had any head injuries.

Q. Well, okay, and then in response to that question, he showed you an injury to his leg?

A. To his right leg, yes.

Q. And you saw that injury?

A. Yes.

Q. And you believed that he was injured?

A. Yes.

Q. And knowing that he had that injury, you still had him try to perform the walk-and-turn and the one leg stand?

A. Yes, sir.

Q. But again, based on your testimony, you just told him to try it and see if he could do it?

A. Yes, sir.

Q. But because of his injury, you knew that the test would not be valid, because of the injury?

A. No, because if he felt he could not do it -- just like the one-leg stand, he told

- 14 -

me, 'I can't do it because my leg hurts.' 'Okay, sir, that's fine, you can stop.'
And at that point it was stopped, for his safety, so he wouldn't fall over either.

Officer Vega was then asked whether injuries affect a person's performance on the field sobriety tests. She answered that depending on the injury, it could affect a person's performance. When asked specifically whether a leg injury would have an effect on a person's ability to perform the walk-and-turn test, Officer Vega responded, "No."

At a suppression hearing, the trial judge is the exclusive fact finder as to the credibility and demeanor of witnesses. The trial court is in the best position to determine the weight and credibility of witness testimony and such decisions will not be disturbed absent a clear abuse of discretion. The only testimony with respect to Appellant's leg injury came from Officer Vega. There was no additional or conflicting evidence offered regarding the extent of the injury or its effect on Appellant's abilities, as related to these tests. Based on the trial court's findings of fact and conclusions of law, the trial court believed Officer Vega's testimony that Appellant's leg injury did not interfere with his performance on the walk-and-turn or one-leg stand tests. In fact, the trial court specifically found that the tests were properly administered in accordance with NHTS standards. Because the evidence supports the trial court's conclusion that the tests were properly administered, the fact that Appellant had a bad leg goes to the weight of the evidence and is not a suppression issue. Accordingly, we find no abuse of discretion in the trial court's refusal to suppress the field sobriety test evidence.

### Breath Test Results

With respect to the results of Appellant's breathalyzer test, Appellant contends only that the breathalyzer results should have been suppressed because of the "long delay" between the traffic stop and the administration of the tests. He does not contest the trial court's findings of fact that Appellant was read the proper warnings and consented to providing a breath sample.

- 15 -

Nor does he challenge the trial court's findings that Officer Acosta properly conducted the breathalyzer exam and that Appellant failed those tests based on results of 0.170 and 0.173. Despite the fact Appellant focused at the suppression hearing on the fifteen minute observation period, he does not mention the observation period on appeal. His brief makes no mention of the fact that the trial court specifically found that Officer Acosta observed Appellant for fifteen minutes prior to conducting the test and noticed that Appellant's "speech was slurred, that he smelled of alcohol and had an unsteady balance." We also note that Appellant cites no authority in support of this argument. An appellant's brief is required to contain a clear and concise argument for the contentions made with appropriate citations to authorities and the record. TEX.R.APP.P. 38.1(i). Failure to cite applicable authority waives an issue on appeal. *Torres v. GSC Enterprises, Inc.*, 242 S.W.3d 553, 559 (Tex.App.--El Paso 2007, no pet.); *Velasquez v. Waste Connections, Inc.*, 169 S.W.3d 432, 436 (Tex.App.--El Paso 2005, no pet.). However, even if Appellant had properly presented his complaint for our review, it is without merit because he did not properly present this issue to the trial court via his written motion to suppress or his argument at the hearing.

The purpose of the motion to suppress is to ask a judge to exclude certain evidence that was improperly obtained. At the hearing, Officer Acosta testified in detail about the process of obtaining a breath sample and about obtaining such samples from Appellant. The evidence presented supports the trial court's conclusion that the breath test was properly administered. Therefore, the trial court did not abuse its discretion in refusing to suppress the evidence related to Appellant's breath intoxilyzer tests.

We agree with the trial court's conclusions that the field sobriety test and the breath intoxilyzer tests were properly administered. We overrule Issue Two.

## CHALLENGES TO PROSPECTIVE JURORS

In Issue Three, Appellant complains that the trial court refused to grant his challenges for cause and his requests for additional peremptory strikes. To preserve error for a trial court's erroneous denial of a challenge for cause, Appellant must demonstrate that: (1) he asserted a clear and specific challenge for cause; (2) he used a peremptory challenge to strike the complained-of venire member; (3) he exhausted his peremptory challenges; (4) his request for additional peremptory strikes was denied; and (5) an objectionable juror sat on the jury. *Davis v. State*, 329 S.W.3d 798, 807 (Tex.Crim.App. 2010), *cert. denied*, -- U.S. --, 132 S.Ct. 128, 181 L.Ed.2d 50 (2011), *citing Green v. State*, 934 S.W.2d 92, 105 (Tex.Crim.App. 1996).

During voir dire, defense counsel challenged four prospective jurors for cause: (1) Mr. Peterson; (2) Mr. Williams; (3) Ms. Hilimon; and (4) Mr. Graveline. The trial court denied all four challenges. After each challenge was denied, Appellant requested an additional peremptory strike. The trial court denied the first three requests for an additional peremptory strike but granted the fourth.[7] To the extent Appellant complains about Mr. Graveline, his complaint is not properly preserved because his request for an additional peremptory strike was granted.

The remaining three complaints are properly preserved. Once the jury was selected, defense counsel informed the court that there were three jurors whom he would have striken had the trial court not denied his challenges for cause and forced him to use three peremptory strikes on jurors Peterson, Williams, and Hilimon. Specifically, counsel stated that he would have used the additional three peremptory to strike Juror No. 2 because he had been involved in a car accident; Juror No. 5 because her husband was retired military, and he believed that military

---

[7] Appellant used all of his peremptory strikes, four of which he used to strike prospective jurors Peterson, Williams, Hilimon, and Graveline.

people are unforgiving and very strict; and Juror No. 6 because she was a teacher and his policy was to always keep teachers off jury panels because they tend to be pro-State.

Having determined that Appellant properly preserved his complaints with respect to the trial court's denial of three of his challenges for cause, we must now determine whether Appellant was harmed by the trial court's ruling. To demonstrate harm, Appellant must show that the trial court erroneously denied one or more of his challenges for cause. *Davis*, 329 S.W.3d at 807; *Chambers v. State*, 866 S.W.2d 9, 23 (Tex.Crim.App. 1993); *see also Feldman v. State*, 71 S.W.3d 738, 744 (Tex.Crim.App. 2002)*, superseded by statute on other grounds*, *as recognized in Coleman v. State*, No. AP-75478, 2009 WL 4696064 (Tex.Crim.App. Dec. 9, 2009)(per curiam)(noting that if a trial judge errs in overruling a challenge for cause, the defendant is harmed if he uses a peremptory strike to remove the objectionable venire member and thereafter suffers a detriment from the loss of the strike.)

When reviewing a trial court's decision to deny a challenge for cause, we look at the entire record to determine if there is sufficient evidence to support the ruling. *Davis*, 329 S.W.3d at 807, *citing Feldman*, 71 S.W.3d at 744. We afford a trial court's ruling on a challenge for cause great deference because the trial judge is in the best position to observe the demeanor and tone of prospective jurors. *Davis*, 329 S.W.3d at 807; *Feldman*, 71 S.W.3d at 744. We will not reverse a trial court's ruling unless the record shows a clear abuse of discretion. *Davis*, 329 S.W.3d at 807; *Cantu v. State*, 842 S.W.2d 667, 682 (Tex.Crim.App. 1992). If a prospective juror indicates bias or prejudice during a portion of voir dire, but the record as a whole establishes that the juror can set aside any impartiality and follow the law, then the court does not abuse its discretion in refusing a challenge for cause of the juror. *Morales v. State*, 875 S.W.2d 724, 725-26 (Tex.App.--Fort Worth 1994, no pet.), *citing Harris v. State*, 784 S.W.2d 5, 22-23

(Tex.Crim.App. 1989).

A defendant may properly challenge any prospective juror who has a bias or prejudice against the defendant or any phase of the law upon which he is entitled to rely. *See* TEX.CODE CRIM.PROC.ANN. art. 35.16(a)(9), (c)(2)(West 2006). Bias is defined "as an inclination toward one side of an issue rather than to the other." *Anderson v. State*, 633 S.W.2d 851, 853 (Tex.Crim.App. 1982), *citing Compton v. Henrie*, 364 S.W.2d 179, 182 (Tex. 1963). The test is whether a bias or prejudice would substantially impair the venire member's ability to carry out the juror's oath and the judicial instructions in accordance with the law. *Gardner v. State*, 306 S.W.3d 274, 295 (Tex.Crim.App. 2009); *Feldman v. State*, 71 S.W.3d 738, 744 (Tex.Crim.App. 2002).

The proponent of the challenge for cause has the burden of establishing that the challenge is proper. *Feldman*, 71 S.W.3d at 747. This burden is not met until the proponent has demonstrated that the prospective juror understood the requirements of the law and could not overcome his or her prejudice well enough to follow it. *Gardner*, 306 S.W.3d at 295; *Feldman*, 71 S.W.3d at 747. In other words, before a prospective juror may be excused for cause, the law must be explained to him, and he must be asked whether he can follow that law, regardless of his personal views. *Gardner*, 306 S.W.3d at 295; *Feldman*, 71 S.W.3d at 747.

### Prospective Juror Peterson

During voir dire, Peterson stated that he was employed as a customs officer. On appeal, Appellant complains that because of his occupation, he was "undoubtedly" biased against Appellant. This claim is based on the following exchange:

> Q. [Defense counsel]: And you indicated that you could be fair and impartial in this case. You can understand my concern. He is facing a criminal charge. Part of your job is enforcing the criminal laws of the United States, and, of course, our county.

And let me just put it this way: If your child or your best friend or family member was on trial for a criminal case, would you feel comfortable with yourself sitting as a juror?

A. [Mr. Peterson]: No.

After this exchange, the State continued the questioning:

Q. [The State]: Mr. Peterson, when you were first asked -- the question is ultimately this: If you get chosen for the jury, and you are sworn to follow the instructions given to you by the Judge, can you follow the instructions that instruct you to be fair and impartial to the defendant?

A. [Mr. Peterson]: Yes.

Q. You responded to [Appellant's counsel] that you wouldn't want somebody like you to be a juror in a case in which a loved one, I guess, is a defendant. But, ultimately, the question is this -- it's the same question it's always been, which is, can you be fair and impartial in this case with what you know so far to this defendant? And will you follow that instruction when it's given to you by the Judge?

Once again, Peterson responded, "Yes."

Appellant recognizes that this second exchange took place but dismisses this colloquy as an attempt to rehabilitate Peterson. Appellant has failed to meet his burden of showing that Peterson could not follow that law regardless of his personal views. In fact, Peterson was specifically asked whether he could be fair and impartial and follow the trial court's instructions, and he answered that he could. Nothing in the record demonstrates that Peterson was somehow biased as a matter of law based on his occupation as a customs agent.

**Prospective Juror Williams**

Mr. Williams was a special agent with the Department of Alcohol, Tobacco and Firearms. He acknowledged that his position is in law enforcement, but he also stated that in his position with ATF, he does not work closely with alcohol related issues. Williams explained that he works mostly with firearms and "federal firearms laws, explosives laws." His job includes

investigating "people that commit violent crimes, or also connected to those investigations, trafficking, firearms trafficking."

When questioned on individual voir dire, Williams affirmatively stated that he could be fair and impartial if chosen as a juror. We decline Appellant's invitation to infer that Williams was biased as a matter of law because of his occupation.

### Prospective Juror Hilimon

Finally, Appellant challenged Ms. Hilimon. During voir dire, Hilimon approached the bailiff and informed him that her son-in-law was a police officer in New York. When she was brought for individual voir dire, the State began by asking the following question:

> Ultimately, the question is this: We all come in here with life experiences, and our family choose whatever profession they choose. But if you are asked to be a juror on this panel, the judge will instruct you that one of the qualifications you may have is to be fair and impartial to this man despite what your son-in-law does.
>
> Can you set whatever feelings you have aside for your son-in-law and his chosen profession and judge this defendant's guilt solely on what you hear over the next couple of days?

Hilimon responded, "Yes." The State then essentially repeated a portion of the question by asking, "Do you feel that you can be fair and impartial to this defendant?" Again, Hilimon responded, "Yes."

Defense counsel then began his questioning by asking Hilimon why she felt the need to talk to the bailiff. Hilimon responded as follows:

> Nothing, really, other than I know many family members have been in this process before in other courts. And they always say you need to let them know that you have relatives. So that's basically because it wasn't asked during either of your questioning.

This exchange followed:

> [Defense Counsel]: To say you are selected as a juror, and basically the only

issue before the jury is disagreement over the credible testimony of the police officer. And, basically, is there any chance -- and I don't even know if you like or dislike your son-in-law.

[Ms. Hilimon]: I love him.

[Defense Counsel]: Is there any chance that if there is a question in your mind in just saying, '[sic]My son-in-law is a good guy and an honest police officer, and I'm going to believe this police officer because he's a police officer; that's my question.

[Ms. Hilimon]: No, it would have to be based on the facts on what's presented.

[Defense Counsel]: Back to the issues that we were talking about, the scientific evidence. I know I got cut off there, but say you believe there was a minor mistake in the application of some kind of scientific evidence, are you going to be attached to one side because he is an officer?

Do you understand what I'm saying?

[Ms. Hilimon]: That was a long question.

[Defense Counsel]: I'll break it down. Obviously, you are selected as a juror, and you believe that he made a minor mistake in some scientific issue. And the law is telling you that you have to ignore that evidence. And it's a minor mistake. And you may even believe it has no effect on the result. But the fact of the matter is you are instructed that they have to do the test the way they are told to, and he didn't do it. I mean, because you believe it's a minor mistake, is there a possibility you would ignore that and ignore that evidence?

[Ms. Hilimon]: I can ignore if he made a mistake.

At that point, Hilimon was excused and Appellant's counsel explained to the court that he was bothered by the fact that she approached the bailiff regarding her son-in-law's occupation as a police officer when that fact was already reflected on her jury sheet. The trial judge responded that she had provided a "reasonable and acceptable" explanation and therefore Appellant's challenge was denied. On appeal, Appellant re-urges his concern that Hilimon approached the bailiff to tell him about her son-in-law's occupation. He cites no authority -- and we have found none -- to support the proposition that Hilimon's son-in-law's occupation renders her biased as a

matter of law.

The proponent of a challenge for cause does not meet his burden of proof until he has shown that the prospective juror understood the requirements of the law but could not overcome his bias or prejudice well enough to follow that law. *Sells v. State*, 121 S.W.3d 748, 758 (Tex.Crim.App. 2003). Prospective jurors Peterson, Williams, and Hilimon all stated that they could set aside any personal feelings and follow the instructions as given by the trial court. It was within the trial court's discretion to weigh their credibility and demeanor and, based on the trial court's ruling, the judge believed that these jurors would follow the law. Finding no error, we overrule Issue Three. *See Feldman*, 71 S.W.3d at 747.

## ADMISSION OF PRIOR OFFENSE FOR ENHANCEMENT PURPOSES

In Issue Four, Appellant argues that the trial court abused its discretion by admitting judgments from two prior DWI convictions because they failed to comply with Texas Code of Criminal Procedure art. 38.33. We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *See Salazar v. State*, 38 S .W.3d 141, 153-54 (Tex.Crim.App. 2001), *cert. denied*, 534 U.S. 855, 122 S.Ct. 127, 151 L.Ed.2d 82 (2001).

Appellant was charged with a felony DWI, third or more. A person may be charged with felony DWI if he has two previous convictions for DWI. TEX.PENAL CODE ANN. § 49.09 (b)(2) (West Supp. 2012). In a felony DWI prosecution, the two prior DWI offenses are necessary elements of the offense and therefore the State must prove the two prior convictions at the guilt-innocence stage of trial. *See Martin v. State*, 200 S.W.3d 635, 640-41 (Tex.Crim.App. 2006); *Zimmer v. State*, 989 S.W.2d 48, 50 (Tex.App.--San Antonio 1998, pet. ref'd). To show that a defendant has been convicted of a prior offense, the State prove: (1) that a prior conviction exists; and (2) that the defendant is linked to that conviction. *Flowers v. State*, 220 S.W.3d 919,

921 (Tex.Crim.App. 2007). However, "[n]o specific document or mode of proof is required to prove these two elements." *Flowers*, 220 S.W.3d at 921. Rather, there are a number of methods by which the State may properly prove the prior convictions alleged for the purpose of enhancement of punishment. *Id*. at 921-22. Such methods include documentary proof that contains sufficient information to establish both the existence of a prior conviction and the defendant's identity as the person convicted. *Id*.; *see also Littles v. State*, 726 S.W.2d 26, 28 (Tex.Crim.App. 1984)(noting that "[o]ne method, and perhaps the most popular with prosecutors because it is the easiest, is the introduction of certified copies of the judgment and sentence and the record of the Texas Department of Corrections or county jail including fingerprints supported by the testimony of an expert witness identifying those prints as identical with known prints of the accused"). The State's burden of proof concerning the prior convictions alleged for the purpose of enhancement of punishment is beyond a reasonable doubt. *Littles*, 726 S.W.2d at 28; *Ex parte Augusta*, 639 S.W.2d 481 (Tex.Crim.App. 1982).

At trial, the State offered misdemeanor judgments from two prior DWI convictions. The judgments were marked as State's Exhibits 12 and 13. The State provided both exhibits to Dale Fernandez, the State's fingerprint expert. He identified both documents as copies of judgments, each with a single fingerprint impression on the bottom and identified the fingerprint impression on each as a right index fingerprint. The State also provided Fernandez with a document marked as State's Exhibit 14. Fernandez identified State's Exhibit 14 as a "fingerprint card." He testified that he created the fingerprint card less than an hour earlier by taking an impression of Appellant's fingerprints. Fernandez then testified that the fingerprint on each of the judgments (State's Exhibits 12 and 13) matched the right index fingerprint on the fingerprint card (State's Exhibit 14). State's Exhibits 12, 13, and 14, were all admitted into evidence over objection.

On cross examination, defense counsel questioned Fernandez about the quality of the fingerprints on the judgments. Most of the discussion focused on the fingerprint on State's Exhibit 13. Fernandez acknowledged that the fingerprint may have been slightly smeared and that a smeared fingerprint complicates a comparison. But he affirmed that he was able to make the comparison and match the fingerprints to those of Appellant. On re-direct, the State asked:

> Approximately 5 billion people on earth, are you satisfied in your professional opinion that the person who made the impressions, or whose impression were made on these judgments is the same person you fingerprinted today?

Fernandez responded, "Yes, I am, 100 percent."

On appeal, Appellant complains that State's Exhibits 12 and 13 failed to comply with Texas Code of Criminal Procedure art. 38.33 because the fingerprint on each of the judgments was not of Appellant's thumb (despite the fact Appellant did have a thumb) and neither judgment identified the finger which was in fact used. Appellant acknowledges that this fact merely makes the judgment voidable, and not void.[8] He also acknowledges that the State may meet their burden of proof linking Appellant to the prior conviction in a number of ways. Nevertheless, he contends that the fingerprints on each of the judgments were smeared and illegible, making it impossible for the State to sufficiently link Appellant to the prior judgments. According to Appellant, "all one has to do is look at the smudged fingerprints on the judgments to conclude that there is no way a fingerprint expert could have examined those prints and concluded they

---

[8] As the State points out, Appellant may not challenge the validity of the prior judgment via a collateral attack. A judgment of conviction should reflect, among other things, the defendant's thumbprint taken in accordance with Article 38.33 of the code. TEX.CODE CRIM.PROC.ANN. art. 42.01 § 1 (23)(West 2006). Article 38.33 of the code of states in part that: "The court shall order that a defendant who is convicted of a felony or a misdemeanor offense that is punishable by confinement in jail have a thumbprint of the defendant's right thumb rolled legibly on the judgment or the docket sheet in the case." TEX.CODE CRIM.PROC.ANN. art. 38.33 (West 2005). However, a judgment that does not contain a defendant's fingerprint is not void. *See Sparkman v. State*, 55 S.W.3d 625, 629 (Tex.App.--San Antonio 2000, no pet.)(holding that absence of thumbprint on judgment does not render conviction void); *see also Porter v. State*, 757 S.W.2d 889, 891 (Tex.App.--Beaumont 1988, no pet.)(noting that "failure to adhere to the requirements of article 42.01 does not render a conviction void, but merely voidable. Such failures are subject to reformation on direct appeal but are not subject to collateral attack.").

belonged to Appellant."

This argument ignores the fact that the jury did look at the judgments and did hear testimony from a fingerprint expert who affirmatively matched the fingerprint on each of the judgments to the fingerprints he took from Appellant the day of trial. It is within the province of the jury to determine the credibility of witnesses and the weight to give their testimony. Based on the jury's verdict, they believed Fernandez's testimony. *See Littles*, 726 S.W.2d at 32.

The judgments of conviction for prior DWI offenses coupled with Fernandez's testimony linking the fingerprints on those exhibits to Appellant was sufficient to meet the State's burden of proof. *See Flowers,* 220 S.W.3d at 922-25; *Johnson v. State*, 725 S.W.2d 245, 247 (Tex.Crim.App. 1987). We overrule Issue Four and affirm the judgment of the trial court below.

May 22, 2013                          ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rivera, and Antcliff, JJ.
Antcliff, J., not participating

(Do Not Publish)